**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael Edward KENNEDY,
Defendant-Appellant.**

No. 81–1066.

United States Court of Appeals,
Ninth Circuit.

Reargued and Submitted March 1, 1983.

Decided Sept. 2, 1983.

Thomas M. Coffin, Asst. U.S. Atty., argued William H. Kennedy, U.S. Atty., Judith Feigin, Thomas M. Coffin, Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Juanita Brooks, Frank Vecchione, San Diego, Cal., for defendant-appellant.

Before KENNEDY, POOLE, and NELSON, Circuit Judges.

KENNEDY, Circuit Judge:

Defendant Michael Kennedy appeals his conviction for rape and felony murder. The crime involved the rape and murder of a young Mexican woman at the United States Port of Entry at San Ysidro, California.

On Friday, November 23, 1979, Josephine Felix, a resident of Corcoran, California, drove to Tijuana, Mexico, for the purpose of smuggling her sister-in-law, Maria Lopez de Felix, into the United States. She hid Maria in the trunk of her car and headed for the Port of Entry at San Ysidro. When they got to the border, a customs inspector discovered Maria and turned the two women over to the immigration office for questioning. The two were photographed, fingerprinted, and put into separate cells at the New Customs Building. Around 1:30 a.m. on November 24 Maria was released. She was pointed toward a set of double doors behind which a corridor would take her back to Mexico.

Having passed through the double doors, Maria encountered Michael Kennedy, a Federal Protection Officer (FPO), who was just returning from the cafeteria. As Maria appeared lost and Kennedy did not know any Spanish, he escorted her over to Customs Inspector Clooney, who helped her find her way towards the corridor to Mexico. Kennedy claims that this was the last he saw of Maria.

On Monday, November 26, 1979, around 10:00 a.m., some thirty-three hours after Maria had been ordered back to Mexico, she was found murdered in an alleyway behind the Old Customs Building at the Port of Entry. She appeared to have been beaten, raped, and strangled. Her face and neck were badly bruised. Her clothing was in disarray: her dress was pulled over her midriff, her underwear was pulled down to her knees, exposing her genital area; a light blue shawl which she had been wearing the evening she disappeared was draped

over her torso and was caked with dirt and debris.

Investigation disclosed that Maria had been murdered in the Old Customs Building. In the surrounding area, investigators discovered bits and pieces of Maria's gold chain, a tassel torn from her shawl, a slip of paper containing the address of Maria's aunt, and Maria's gold-plated religious medallion. Her shoes and purse were found hidden in the toilet tank of one of the adjoining cells. Investigators also came across several "Kool" brand cigarette butts and pieces of masking tape that appeared to have been left there by the killer.

Kennedy came to be suspected because he was one of the only two people on duty the night the victim had disappeared who possessed a key to the padlocked gate to the area where the murder occurred, and because he habitually smoked "Kool" brand cigarettes. On December 3, Kennedy was questioned about the events of November 25. He admitted to encountering Maria briefly just before directing her to inspector Clooney. Unlike Clooney, he placed that encounter around 2:00 a.m. After leaving Maria with Clooney, Kennedy said he went to the FPO booth along the corridor to Mexico, where he remained for some 20 to 30 minutes. FPO John Doe, who was on duty with Kennedy, however, testified that he was alone in the FPO booth during that very time period, and that he did not see Kennedy again until 5:30 a.m.

Kennedy was charged with murder, felony-murder, and rape. Following a thirteen day trial in June 1980, the jury was unable to reach a unanimous verdict on all counts. It acquitted Kennedy of the murder charge, but was divided as to the remaining charges. A second jury trial was held in August 1980 and again ended in mistrial. A third trial, forming the basis for this appeal, began on November 24, 1980. Kennedy this time was convicted on both of the remaining counts. He was sentenced to life imprisonment on each count, the sentences to run concurrently.

I. Sufficiency of the Evidence

Appellant argues that there was insufficient evidence to convict him of rape and felony murder. To demonstrate that the evidence is sufficient, we find it necessary to set forth here the principal elements of the Government's case and the refutations the defense offers. Although this is a close case, we conclude that the evidence presented, considered in the light most favorable to the Government, was sufficient to permit a jury rationally to conclude that appellant is guilty beyond a reasonable doubt. *See United States v. Sims,* 617 F.2d 1371, 1374 (9th Cir.1980); *United States v. Nelson,* 419 F.2d 1237, 1242 (9th Cir.1969).

The evidence whose probative value is disputed consisted of the following:

*Evidence of Intercourse.* Vaginal smears taken from the victim's body disclosed the presence of semen. Appellant's expert testified that the low acid phosphatase level of the smears proves that the victim did not have intercourse within twenty-four hours of death. The Government presented three answers to this. First, the swabs used by appellant's expert to test for semen had thawed in the shipment. Such thawing would significantly lower the acid phosphatase level. In addition, the Government's expert pointed out that low levels of acid phosphatase were not incompatible with the occurrence of a recent act of intercourse. The acid phosphatase level was a function of many other variables. Finally, the Government's toxicologist submitted tests of his own that in fact revealed high levels of acid phosphatase. The jury could accept the Government's theory.

Appellant also challenged the results of a Government test showing that the person with whom the victim last had intercourse was, like appellant, a non-secreter (a male who does not secrete his blood type in semen). Only 20 percent of the male population has the non-secreter characteristic. (The defense's principal suspect, FPO Doe, in fact is a secreter.)

The defense expert argued that the extremely diluted nature of the tested semen—due to the passage of time, vaginal

secretions, and the victim's involuntary urination at the time of death—could have prevented any identification of blood types. The Government gives three answers to the argument that the sample was diluted. First, it noted that appellant's expert witness was unable to tell how long the urine had been on the victim's fabric, so the dilution might not have occurred at the time of death. Second, tests done on semen taken from the victim's slip (upon which no diluting urine was found) also showed that the person with whom she had had intercourse was a non-secreter. Third, the Government claimed to have had a sufficient amount of undiluted semen to test. The resolution of these matters was properly for the jury, and it could accept the Government's theory.

Finally, appellant contends that the location of the semen on the victim's underwear indicates that she put her clothes on and walked around after sexual intercourse. This fact, appellant argues, is inconsistent with the Government's theory of how the rape and the murder occurred. The Government notes in reply that the semen on the panties could have been deposited in the course of the struggle preceding the rape, or indeed might stem from an earlier act of intercourse. The issue was one of fact for the jury.

*Hair Identification Evidence.* The defense contends that the Government's hair identification evidence was not probative. The evidence consisted of four head hairs removed from the victim's shawl and one pubic hair taken from the blanket in which the authorities had temporarily wrapped the body.

Appellant challenged the accuracy of hair identification in general. His expert contended that, at most, hairs fall within a similar range of characteristics, and that no identical matches are possible. The Government's expert testified that over the course of 50,000 to 60,000 examinations through his career, he was unable to distinguish between hairs taken from different individuals only 50 to 60 times, and that in this case he was quite certain that the hairs

in question belonged to the defendant. The jury could choose to believe the Government's contention.

*Adhesive Residue on Defendant's Pocket Knife.* The Government put in evidence the defendant's pocket knife covered with adhesive tape residue. In order to gain access to the Old Customs Building, the killer would have had to cut through some tape tying together the gates that led to the building. The Government pointed out that adhesive residue on the knife seemed to be from a tape just long enough to hold together the two gates.

Appellant maintains that his father had used the knife while taping up some paneling in the family garage. Indeed, the adhesive on the two rolls of tape at the Kennedy home also matched the residue found on the tape. Appellant added that the adhesive residue might also have accumulated when he had originally taped the two gates together. Finally, appellant's expert presented photographic evidence to show that the width of the space between the two gates was narrower than the width of the adhesive residue on the appellant's knife.

*Paint Particles on Defendant's Clothing.* The Government submitted into evidence certain pieces of the defendant's clothing containing gray paint particles evidently stemming from the floor of the Old Customs Building where the rape had occurred. Appellant argued that he had not worn the suit on the night in question, and that the paint particles had accumulated on his shoes during routine inspections of the Old Customs Building and had then been transferred from his shoes to his clothing when he took it off. The issue was one for the jury.

*Evidence Concerning the Time of Death.* The time of death became a pivotal issue in the case. If the death occurred, as the Government's expert argued, within 24 to 36 hours before the body was discovered, it points towards appellant's guilt. If the death occurred, as the appellant's expert insisted, within 12 to 24 hours of the body's being found, it points towards innocence as appellant was not on duty at the time.

Appellant's expert based his conclusion on an examination of the body's state of rigor mortis. He based his testimony on photographs of the victim. The Government expert, in contrast, had conducted an autopsy.

FPO Ferris testified for the defense. He had patrolled the Old Customs Building area on the day after the defendant allegedly committed the murder and did not discover the body. The Government, in turn, suggested that Ferris was not familiar with the area in question. It presented a prior statement by Ferris, made shortly after the body was discovered, in which he fixed a mistaken location for the point the body was discovered.

*Kool Cigarette Butts.* Investigators took four cigarette butts from the scene of the crime. Only cigarette butts that looked fresh were picked up for examination. Each of the fresh butts was a Kool, the brand smoked by the appellant. FPO Doe, the Government noted, was a nonsmoker.

Appellant argues the Kool butts could have been left there by the actual perpetrator (in its contention, FPO Doe) in order to frame him. He argues that he would not have been foolish enough to leave butts from Kool cigarettes—a relatively uncommon brand—scattered about the crime scene. The Government counters that someone hurriedly covering up a crime may make mistakes, and the trier of fact was entitled to adopt this view.

The Government's case rests upon an accumulation of evidence. While we concede that no single evidentiary item listed above would support the jury's verdict, the accumulation of it does. The evaluation of the evidence is the principal task of the jury. We cannot say that the jury's verdict was unsupported even by the standard for criminal cases which is proof beyond a reasonable doubt.

## II. Limitations on Cross-Examination

 Appellant asserts that limitations placed upon his cross-examination of FPO Doe infringed the sixth amendment right to confront witnesses. We reject this argument. A defendant does not enjoy unrestricted latitude in the cross-examination of adverse witnesses. He is limited to issues relevant to the trial, and it is within the broad discretion of the trial court to determine which issues are relevant. *Chipman v. Mercer,* 628 F.2d 528, 531 (9th Cir.1980); *Skinner v. Cardwell,* 564 F.2d 1381, 1388 (9th Cir.1977), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978); *see also Perry v. Rushen,* 713 F.2d 1447 (9th Cir. 1983) (no unrestricted right to present evidence to identify another as the culprit). When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness. *United States v. Bleckner,* 601 F.2d 382, 385 (9th Cir.1979).

 During his cross-examination of Doe, the appellant was able to bring out that both appellant and Doe had once applied for a position with the Federal Customs Service, but that only the appellant had been accepted. The trial court prevented the appellant from showing that Doe was jealous and angry at him. Since about thirty people applied for the customs job and about twenty were hired, however, this line of inquiry was only of marginal relevance. The trial court did not abuse its discretion in limiting cross-examination as it did.

 The trial court also properly foreclosed questions about Doe's past membership in the Hell's Angels. Since Doe's involvement was more than ten years old, it detracted only minimally from his credibility. *See* Fed.R.Evid. 608(b) advisory committee notes (specific instances of past conduct inquired into must be probative of truthfulness or its opposite and not remote in time). Disclosing it in court was likely to unduly prejudice the jury.

 The appellant sought to show that FPO Doe had a history of sexually abusive behavior and was thus himself the likely killer. He tried to bring out Doe's arrest for distribution of pornography in 1973, his

penchant for drawing obscene pictures on magazines, and his removal from the police reserves for making snide comments on sex with children.

Although these points present a close question, the trial court did not abuse its discretion in its determination of relevancy. The trial court could properly find Doe's indiscretions too tangential to advance appellant's contention, rendering inquiry about them collateral. The jury, moreover, received an ample presentation of appellant's theory. *Cf. Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (conviction overturning defense not permitted to explore reasons for bias); *Chipman, supra* (conviction overturning bias inquiry foreclosed in its entirety).

III. Exclusion of Testimony

■ The trial court refused to permit appellant to call two witnesses, one, a security guard named Jesse Garcia, and the other, a karate expert. As a general rule, a trial court has wide discretion in determining the admissibility of evidence, and its determination will not be overturned absent an abuse of discretion. *United States v. Wright,* 667 F.2d 793, 800 (9th Cir.1982).

■ Jesse Garcia was a security guard at appellant's first trial. During that trial she and Doe dated. When Garcia refused to go out with Doe again, Doe allegedly said "Are you afraid of ending up like the other one did?" and "You're as dumb as she was." Appellant argues that these statements are relevant to show that, contrary to his testimony at trial, Doe had actually met Maria Lopez.

The trial court was within its discretion in prohibiting the proffered testimony. Doe's first statement does not indicate that he actually knew the victim. More plausibly, Doe was simply asking Garcia whether she refused to date him because of appellant's theory that he was the killer. Doe's second statement was simply an allusion to the trial. The statements were barely relevant and hence properly excluded.

Appellant claims that the karate expert's testimony would advance significantly his theory that Doe was in fact the killer. It had earlier been established that Doe was a brown belt in karate, and that he had not practiced in three years. The expert would have testified as to the abilities of a brown belt who had not practiced for several years. He would also have pointed out that in his twenty-five years of experience he had frequently seen karate blows identical to those found on the victim. The Government argues that karate does not qualify as an area of expertise, and that since the alleged expert never had a first-hand opportunity to examine the victim, his testimony would be so speculative as to be nearly useless.

■ Where the court excludes expert testimony, its decision will not be reversed unless manifestly erroneous. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Reno-West Coast Distribution Co., Inc. v. Mead Corp.,* 613 F.2d 722, 726 (9th Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979); *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973). *Cf. United States v. Booth,* 669 F.2d 1231, 1240 (9th Cir.1981) (abuse of discretion standard). Testimony that Maria Lopez *could* have been killed by a karate chop and that Doe *could* have administered such a blow would not add materially to evidence already before the jury; this is not a situation in which an ordinary layman would need expert opinion to reach the conclusion argued. Under either an abuse of discretion or a manifest error standard, the trial court's exclusion of the expert testimony is not reversible.

IV. Advance Ruling on Index Cards

In a legal search of appellant's possessions, the FBI found a stack of index cards containing the names, addresses, and license plate numbers of various women. According to the FBI, most of these women did not know appellant; he had apparently compiled the cards by copying the license plate numbers of women he observed and

by obtaining their addresses through law enforcement channels.

The trial court ruled that these index cards were unduly prejudicial and thus not admissible during the prosecution's case-in-chief. It refused to rule in advance, however, that the cards would not be admissible to impeach appellant should he elect to testify. Appellant argues on appeal that this refusal to rule in advance precluded him from testifying, thus depriving him of his constitutional right to effective assistance of counsel.

■ In reviewing the trial court's failure to make the requested advance ruling here, we adopt the analysis of the Second Circuit and the Eighth Circuit. *United States v. Pfingst,* 477 F.2d 177 (2d Cir.), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *United States v. Witschner,* 624 F.2d 840 (8th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980). The trial court has discretion to issue an advance ruling, but it need not do so, even if the refusal to do so prevents a defendant from testifying in his own behalf. *Pfingst, supra,* at 193; *Witschner, supra,* at 844; *see also United States v. Cook,* 608 F.2d 1175, 1186 (9th Cir.1979) (en banc) (pretrial ruling on admissibility of prior convictions left to discretion of trial court), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). The test on appellate review is whether the trial court abused its discretion in failing to issue an advance ruling. *Pfingst, supra; Witschner, supra.*

■ The trial court did not abuse its discretion here. The relevance of the index cards depended on what the appellant would have said once he had actually taken the stand. An advance ruling would have required speculation the trial court was not required to undertake.

V. Destruction of Evidence

■ While the investigation of Maria Lopez's murder was in progress, the Government destroyed some relevant evidence in the case: the latch and rivets on the FPO guard booth and certain semen stains on the victim's panties and slip. To determine whether we are required to set aside the conviction on this ground, we must weigh the extent of the Government's culpability and the degree of prejudice to the appellant. *United States v. Loud Hawk,* 628 F.2d 1139, 1151–54 (9th Cir.1979) (en banc), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980).

■ The appellant suffered a cut on his right index finger on the night of the crime. He maintained that he had cut himself with his pocket knife while pushing a rivet into the latch of the FPO guard booth. The Government argued that appellant's cut had been sustained while getting Maria back into the Old Customs Building, and that the story of pushing the rivet was a cover. FPO Anderson testified that he examined the latch and found no blood or scratch marks on the rivets. He also testified that he found an unsigned injury report two days after the crime reporting that an officer had injured his finger tightening a *screw* on the guard booth latch. Subsequent to appellant's statement to the FBI and Anderson's investigation, the latch and rivets were apparently removed and destroyed by the General Services Administration in the course of regular maintenance.

We realize that appellant has been prejudiced by his inability to examine the latch and rivets. Nevertheless, we do not find reversal appropriate. First, the latch and rivets were destroyed innocently, if negligently, by an independent arm of the Government in the regular performance of its duties—this case does not involve intentional or wrongful destruction of evidence by law enforcement or prosecutorial officials. Second, the evidence bore at best on a collateral issue in the case—how appellant cut his finger on the night of the murder. On balance we find the Government's conduct insufficiently culpable to merit rever-

sal given the limited degree of prejudice to appellant.[1]

■ Nor does the FBI's destruction of semen stains on the victim's panties and slip warrant reversal. The FBI's tests necessarily entailed the destruction of some of the stains; there was thus no negligence or bad faith on the part of the Government. Further, appellant had ample opportunity to cross-examine the FBI expert regarding testing procedures and methods, and appellant's experts were given another portion of the semen stains from the panties as well as additional stains from the slip that had not been tested by the Government's experts.

## VI. Prosecutorial Comment

■ Appellant asserts that during closing argument the prosecutor made comments respecting appellant's failure to testify that are impermissible under *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).[2] Prosecutorial comment mandates reversal "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal." *Anderson v. Nelson,* 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968) (per curiam). Nevertheless, where the prosecutorial comment was a single isolated statement, where it did not stress any reference to guilt, and where it was followed by curative instructions, we have been reluctant to reverse. *See United States v. Armstrong,* 654 F.2d 1328, 1336 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982).

■ Because appellant neither objected to the prosecution's statements nor asked for a specific curative instruction, there must be plain error to afford a basis for reversal. *United States v. Perez,* 491 F.2d 167, 173 (9th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). We may review plain error even absent a timely objection, *United States v. Lopez,*

1. Appellant also contends that Anderson should not have been allowed to testify about his observations. Anderson admitted, however, that he neither observed the rivets with any type of magnifying equipment, nor performed any tests to detect the presence of blood. We see no reason to doubt the jury's ability to accord Anderson's observations the evidentiary weight they deserved.

2. The relevant portion of the prosecutor's statement is as follows:

Now, we come to some testimony about the hair and the paint, and some statements that Michael Kennedy made, and when it comes to the hair, the head hair on the shawl, Mr. Landon [defense counsel] asked you to consider that it's possible that Michael Kennedy brushed against Maria Lopez as he was directing her, and therefore his head hairs were transferred in that process.

I'd like to point out something for you. There is not one shred of evidence in this case that that is what happened, not one shred of testimony. Similarity [sic]—he says that the presence of the paint on the trousers can be explained by the possibility that Michael Kennedy took his trousers off over his shoes, and, again, there is not one shred of testimony in this case to back that up, not one.

Mr. Landon complains about the deficiencies in the Government's case, what he claims to be deficiencies, i.e., nobody saw how she was

led back into the old customs building. That is not a deficiency, because it is not important for you to decide how she was led back there. And, two, that is something that is due to the nature of the case.

Maria Lopez is dead. I can't call her to the stand to tell you how she was led back, but the theories Mr. Landon is bringing forth now, these possibilities, he doesn't receive [sic] from any apparent deficiencies like that, and where he suggests to you that the paint on the shoes, on the trousers, can be due to taking the trousers off over the shoes, reject that. He didn't prove that. He didn't call anybody to the stand to say what had happened. He doesn't suffer from that liability. When he tells you to consider Michael Kennedy's statements to the F.B.I., just like the testimony of all the other witnesses in this case, that is a subtle misconception. He is not like every other witness in the case. That statement did not come from the stand. It was not under cross-examination.

The other statements in this case we've been referring to did, and there is a difference there, and I want you to recognize it.

The statement that was brought out through agent Vardell is an out-of-court statement, made out of your presence, and you simply can't deal with that statement like you can with the statement of a witness who is up here testifying in front of you, under oath, so don't be thrown off by that.

[R.T. 2401–02]

575 F.2d 681, 685 (9th Cir.1978); Fed.R. Crim.P. 52(b), but "we reverse a criminal conviction on the basis of plain error 'in the very exceptional situation only, situations wherein it appears to be necessary in order to prevent miscarriages of justice or to preserve the integrity and reputation of the judicial process.'" *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.) (quoting *Marshall v. United States,* 409 F.2d 925, 927 (9th Cir.1969)), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). Before granting review, moreover, we consider "(1) whether the error or misconduct was serious and (2) whether the reasons for requiring an objection apply." *United States v. Berry,* 627 F.2d 193, 199 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981).

The prosecutor's statement that appellant "is not like every other witness in the case" because his statements were not made on the witness stand had been invited by the appellant's closing statement. The appellant's counsel had on several occasions complained that the prosecutor attached great weight to discrepancies in appellant's statement to the FBI while dismissing as harmless discrepancies in the testimony of "every other witness in the case." Counsel's suggestion that appellant was in fact a witness invited a prosecutorial response that he was not.

The prosecutor's comment with respect to the defense's lack of testimony on particular issues presents a closer question. Nevertheless, we do not believe there was plain error warranting a reversal. First, the statement in question was an isolated one during the course of lengthy closing arguments. Second, the prosecution's reference to appellant's failure to take the stand was oblique and somewhat obscure. Finally, the prosecution did not in any sense stress appellant's silence as evidence of guilt. Under these circumstances, any prejudice to the defendant was minimal and could have been further reduced had appellant brought to the trial judge's attention the possibility of a curative instruction.

VII. Conclusion

As we find the evidence here sufficient to support appellant's conviction, and we find no errors warranting reversal, we affirm.

AFFIRMED.