**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Samantha D. LOPEZ; Ronald J. McIntosh, Defendants–Appellants.**

**Nos. 87–1213, 87–1214.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1988. Decided Sept. 15, 1989.

Geoffrey Hansen, Asst. Public Defender, San Francisco, Cal., for defendant-appellant Lopez.

Judd C. Iversen, Claire Leary, San Francisco, Cal., for defendant-appellant McIntosh.

Joseph P. Russoniello, U.S. Atty., Mark N. Zanides, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before CHOY, SNEED and HUG, Circuit Judges.

HUG, Circuit Judge:

On November 5, 1986, Ronald J. McIntosh landed a helicopter on the grounds of the Federal Correctional Institution at Pleasanton ("FCI Pleasanton") in order to effect the escape of his girlfriend, Samantha D. Lopez. Although the escape was initially successful, the two were apprehended ten days later near Sacramento. As a result of this incident, Lopez was convicted of escaping from federal custody, and McIntosh was convicted of aiding Lopez' escape, air piracy, and using a gun in the commission of air piracy. Both Lopez and McIntosh asserted the defense of necessity at trial. On appeal, they contend that the district court's jury instructions concerning that defense were erroneous. McIntosh also argues that an instruction on lesser included offenses should have been given and that error was committed in limiting the scope of cross-examination of a witness. We unanimously affirm all convictions except McIntosh's conviction for aiding escape. The majority of the panel affirms that conviction. In section II B of this opinion, we all find the instructions on the necessity defense were erroneous. Judge Hug, in this opinion, concludes the error is not harmless. However, in the concurring opinion of Judge Sneed, in which Judge Choy joins, the conclusion is that the error is harmless. The majority of the panel, thus, affirms the conviction for aiding escape.

I.

FACTS

Lopez and McIntosh met and became romantically involved in December 1985 while both were inmates at FCI Pleasanton. At that time, Lopez was serving a 50-year sentence and was not scheduled to become eligible for parole until October 1991. McIntosh's presumptive parole date was February 14, 1988. In mid-1986, McIntosh asked to be transferred from FCI Pleasanton to the Federal Prison Camp at Lompoc, California ("Lompoc"). His request was approved, and he was scheduled to be transferred on October 28, 1986. On that date, McIntosh was released from the Pleasanton facility and allowed to travel to Lompoc without supervision. Instead of reporting to Lompoc as instructed, however, McIntosh escaped.

Evidence presented by the government at trial indicates that McIntosh spent the time between his escape on October 28 and Lopez' escape on November 5 preparing for Lopez' removal from FCI Pleasanton. On October 31, McIntosh, already an experienced helicopter pilot, took a practice flight with an instructor from Navajo Aviation. For purposes of this practice flight, McIntosh assumed the alias Lyle Thompson. Also on October 31, McIntosh and another individual, Ken Lee Hamilton, rented an apartment in Carmichael, California. In discussions with the apartment manager, Hamilton identified McIntosh as Bill Staf-

ford. Finally, on November 4, McIntosh went to Aris Helicopter in San Jose, California and, using a third alias, Fred Holbrick, made arrangements to take a helicopter flight the next day.

When McIntosh arrived at Aris on November 5, he told Peter Szabo, the pilot assigned to his flight, that the purpose of the trip was to survey some land that he intended to purchase and develop. According to Szabo's testimony at trial, the two men took off in the helicopter and flew northwest, eventually entering Bollinger Canyon near Danville. After circling the canyon twice, McIntosh asked Szabo if they could land. Szabo, however, refused, reminding McIntosh that company policy forbade such landings absent permission from the landowner. At that point, Szabo claims he heard McIntosh say "set it down." He further states that, when he turned toward his passenger, he realized McIntosh was pointing a pistol at him. He therefore landed the helicopter as instructed.

According to Szabo, after he set the helicopter down, McIntosh ordered him to get out of the aircraft and then flew off alone. The time was approximately 10:45 a.m. At 11:15, the helicopter approached FCI Pleasanton. McIntosh landed the helicopter on the prison athletic field, and Lopez, who had been waiting there for McIntosh, got into it. Having successfully retrieved Lopez, McIntosh took off and flew away. The entire incident took less than a minute.

The two fugitives were eventually apprehended on November 15, 1986 as they attempted to purchase wedding rings and other jewelry at a jewelry store near Sacramento. Soon thereafter, the pair was indicted for their participation in the events of November 5. 662 F.Supp. 1083 (N.D. Cal.1987). Specifically, Lopez was charged with escaping from federal custody, in violation of 18 U.S.C. § 751 (1982), and McIn-

tosh was charged with aiding Lopez' escape, in violation of 18 U.S.C. § 752 (1982), air piracy, in violation of 49 U.S.C.App. § 1472(i) (1982), and using a gun in the commission of air piracy, in violation of 18 U.S.C. § 924(c) (Supp. II 1984).[1]

At trial, neither Lopez nor McIntosh disputed the fact that Lopez escaped from FCI Pleasanton in November 1986. Nor did they challenge the government's assertion that McIntosh aided Lopez in that escape. Rather, Lopez and McIntosh defended on the ground that Lopez' escape was necessary because her life had been threatened by prison authorities and was in immediate danger.[2]

According to Lopez, her problems at the prison began in early 1986. At that time, Lopez was a member of the Inmate Council, a group organized to act as liaison between the prisoners and the administration. She also worked in the business office at FCI Pleasanton where she often handled the prison's financial records. Lopez testified that she went to the warden in March 1986 with a long list of prisoner complaints. She claims that the warden responded to her concerns by stating that he did not care about the prisoners' problems and that no one else cared either. Lopez allegedly then told the warden that, while people on the outside might not care about the prisoners' complaints, they would probably be interested in the evidence of misappropriation and mismanagement of funds that she had uncovered while working in the business office. According to Lopez, the warden responded by threatening her life, intimating that she might not live long enough to take her case before the parole board and remarking that "accidents happen in prisons every day."

1. McIntosh's escape on October 28, 1986 is the subject of separate proceedings.

2. Such a necessity defense, if established, excuses the otherwise criminal act of escape. See *United States v. Bailey,* 444 U.S. 394, 410–13, 100 S.Ct. 624, 634–36, 62 L.Ed.2d 575 (1980); *United States v. Williams,* 791 F.2d 1383, 1388 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93

L.Ed.2d 159 (1986); *United States v. Peltier,* 693 F.2d 96, 98 (9th Cir.1982) (per curiam). As Justice Field remarked over a century ago in *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 487, 19 L.Ed. 278 (1868), a prisoner who breaks out of a prison because it is on fire should not be held accountable under the law "for he is not to be hanged because he would not stay to be burnt."

In the months following her interview with the warden, various other prison officials allegedly began to torment and threaten Lopez.[3] Lopez contends that the situation grew so intolerable that she feared her life was in immediate danger and that the only alternative available to her was escape. McIntosh, in turn, argues that, given the danger Lopez was in, he had no choice but to "rescue" her from the prison.[4]

After hearing the evidence presented by Lopez and McIntosh, the jury rejected their necessity defense and convicted them on all counts. Thereafter, the trial court sentenced Lopez to a five-year term for escape to run consecutive to her prior conviction. McIntosh received a 20-year sentence on the air piracy count, a concurrent five-year sentence for assisting Lopez' escape, and a consecutive five-year sentence on the gun charge.

Both Lopez and McIntosh have timely appealed to this court. Our jurisdiction is predicated upon 28 U.S.C. § 1291 (1982).

## II.

### THE NECESSITY DEFENSE INSTRUCTIONS

■ Lopez and McIntosh's primary contention on appeal is that the district court's instructions to the jury on their respective necessity defenses were defective.[5] Lopez claims that the district court misstated the law of necessity in its instructions and improperly refused to give a supplemental theory-of-the-case instruction. McIntosh argues that the district court erred by importing a fourth element into his necessity defense that resulted in his being held criminally liable for the actions of another.

3. For instance, in December 1985, one prison guard allegedly told Lopez that if she continued to make waves, she was going to "drown." That same officer allegedly entered her room in May, told her he ought to slap some sense into her, and pushed her to the ground. When the guard learned of her later complaint to an associate warden, Lopez claims he threatened to "fix" her.

Another prison guard is accused by Lopez of entering her room late at night in June 1986. According to Lopez, he threw a glass of what he claimed was acid in her face. It turned out to be water. Later that month, this same guard allegedly gave Lopez a box of razor blades. When she returned to her room, she discovered a red, sticky substance akin to blood spread all over her sink and toilet. As Lopez tells it, the guard suggested during a subsequent visit to her room that she do everyone a favor and kill herself.

A third member of the prison staff allegedly pushed Lopez into a concrete conversation pit in July or August of 1986. Thereafter, the officer apparently asked for a truce and stated that he left a peace offering in Lopez' room. Lopez claims the can of soda she later found in her quarters was filled with shards of glass. Lopez further claims that this guard threatened her with a switchblade in September 1986. Finally, Lopez testified that one of her tormentors told her that she would be "dead meat" as soon as McIntosh was transferred in October.

The government, of course, disputes these allegations. Each individual accused by Lopez took the stand and denied that the alleged encounters ever occurred. The government also introduced evidence that Lopez repeatedly failed to report these alleged threats, either to prison personnel or to other individuals outside the prison. Further, it presented prison records

in an attempt to prove that the guard accused of throwing water on Lopez was not on the prison grounds at the time of the alleged attack. Finally, the government presented testimony to the effect that the money shortages Lopez claims to have discovered were illusory.

4. McIntosh did not testify at trial. In support of his position, however, he presented expert psychiatric testimony establishing that he developed chronic post-traumatic stress disorder ("PTSD") as a result of his experiences in Vietnam. According to his expert, the PTSD contributed to McIntosh's distrust of prison authorities and his need to rescue Lopez from what he perceived to be a life threatening environment.

5. As an initial matter, the government argues that there was insufficient evidence to instruct the jury on necessity. Thus, it urges, any error in the instructions actually given must necessarily be harmless. "[It] is well established that a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Yarbrough*, 852 F.2d 1522, 1541 (9th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). In the necessity context, the proper inquiry is whether the evidence offered by a defendant, if taken as true, is sufficient as a matter of law to support the defense. *See United States v. Allen,* 798 F.2d 985, 1004 (7th Cir.1986); *United States v. Dorrell,* 758 F.2d 427, 430 (9th Cir.1985). We have reviewed the extensive evidence submitted by the defendants and conclude it was sufficient to justify the instructions.

We address each defendant's arguments in turn.

## A. *Lopez' Necessity Instructions*

The jury was instructed on Lopez' necessity defense as follows:

In this case, the defendant Lopez contends that the act charged in count one, namely, prison escape, was justified by the—by duress or necessity.

"Legal justification" means that an otherwise criminal act may not be punished, if that act was necessary in order to avoid a significantly greater evil. The four elements of Ms. Lopez's necessity defense are:

One, that the threat or threats to Ms. Lopez, and the fear which the threats caused, were immediate, and involved death or serious bodily injury;

Second, that Ms. Lopez['s] fear was well-grounded. This means that Ms. Lopez had a good-faith belief in the imminence and severity of the threat, and that belief must also have been objectively reasonable;

Three, that there was no reasonable and legal opportunity to avoid or escape the threatened harm; and

Four, that Ms. Lopez made a bona fide good-faith effort to surrender to authorities after she reached a position of safety.

The government must prove all elements of the crime of prison escape, including the lack of justification, beyond a reasonable doubt. This means that you may not find Ms. Lopez guilty of the crime of prison escape unless the government proves beyond a reasonable doubt that at least one of the elements of her claimed defense of necessity is not present. That is, if the government proves beyond a reasonable doubt that at least one of these elements is not present, then the defense of necessity or duress is no longer applicable.

Lopez initially challenges the district court's formulation of the fourth element of her defense. The district court instructed the jury that necessity was unavailable as a defense unless Lopez "made a bona fide good-faith effort to surrender to authorities *after she reached a position of safety.*" Lopez concedes that this "position of safety" language has been repeatedly endorsed by this circuit. *See, e.g., Williams,* 791 F.2d at 1388 (quoting *Peltier,* 693 F.2d at 98); *United States v. Jennell,* 749 F.2d 1302, 1305 (9th Cir.1984), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). Nevertheless, she argues that the wording is improper and that the jury should instead have been told that an attempt to surrender to authorities need be made only *"after the claimed threats lost their coercive force."* Although Lopez proposed this alternate language, the district judge rejected it.

■ According to Lopez, the district court's language misstates the law by establishing an objective test for surrender while her proposed language, taken from the Supreme Court's decision in *Bailey,* 444 U.S. at 415, 100 S.Ct. at 637, properly identifies the standard as a subjective one. Whether a jury instruction misstates the applicable law is a legal question we review *de novo. See Collins v. City of San Diego,* 841 F.2d 337, 340 (9th Cir.1988); *see also Poling v. Morgan,* 829 F.2d 882, 885 (9th Cir.1987) (whether instructions "set out the law incorrectly" reviewed *de novo* ).

We find Lopez' argument unavailing. The language used by the *Bailey* Court need not, as she asserts, imply a subjective standard. Whether a threat has lost its coercive force *can* be judged objectively. Similarly, it is possible to determine whether, from an objective standpoint, an individual has reached a position of safety. We conclude that *Bailey* and the decisions of this circuit establish an objective test.

■ In order to take advantage of a necessity defense to an escape from prison charge, then, a defendant must make a bona fide effort to surrender to the authorities after reaching what, from an objective perspective, is a position of safety. To hold otherwise would be to allow escapees the benefit of a necessity defense whenever they claim that they failed to surrender because, subjectively, they still feared for their lives. This approach would be most unwise as subjective beliefs are easily fa-

bricated and almost impossible to disprove. Of course, evidence of a defendant's subjective beliefs will always be relevant to the objective analysis. We hold only that such subjective beliefs are insufficient, in themselves, to establish the fourth element of a successful necessity defense unless those beliefs are also found to be objectively reasonable. The district court's instruction in this case correctly stated the law. It was therefore not error to refuse Lopez' alternate formulation.

Lopez' second argument also involves the fourth element of her necessity defense. During trial, Lopez asked the district court to add the following instruction to its general instructions on necessity: "You are hereby instructed with regard to the fourth element of Ms. Lopez' defense that making efforts to contact her former attorney represents a bona fide effort to surrender to authorities." The district judge, however, refused to give the proposed instruction. Lopez contends that this denial constitutes refusal to instruct on her theory of the case.

■ We review *de novo* a district court's failure to instruct on a defendant's theory of the case. *United States v. Doubleday*, 804 F.2d 1091, 1093 (9th Cir.1986), *cert. denied*, 481 U.S. 1005, 107 S.Ct. 1628, 95 L.Ed.2d 201 (1987). Moreover, we have deemed such a failure reversible error if the instruction "is supported by law and has some foundation in the evidence." *United States v. Makhlouta*, 790 F.2d 1400, 1405 (9th Cir.1986) (citation omitted). It is not error, however, to reject a theory-of-the-case instruction if the other instructions in their entirety cover the defense theory. *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). Indeed, "[s]o long as the instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion." *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir.1985) (citing *United States v. Abushi*, 682 F.2d 1289, 1299 (9th Cir.1982)).

■ In the instant case, it is clear that Lopez' defense theory—necessity—was adequately presented to the jury through the instructions actually given by the trial court. The Supreme Court has stressed that once a trial court concludes that sufficient evidence of necessity exists to present the defense to the jury, it is for the jury not the trial judge to determine the credibility of witnesses and assess the merit of the defendant's claim. *See Bailey*, 444 U.S. at 414–15, 100 S.Ct. at 637. It was therefore particularly within the province of the jury in this case to determine whether, under all the facts and circumstances, a bona fide effort to surrender to the authorities had been made. Lopez' attempt to circumscribe the jury's role as factfinder through her proposed instruction was clearly improper and was correctly rejected by the trial judge.

We conclude that neither of Lopez' challenges to her jury instructions has merit. We therefore affirm Lopez' conviction for her escape from prison.

## B. *McIntosh's Necessity Instructions*

■ Although McIntosh's necessity defense was to the charge of assisting escape rather than escape itself, the jury instructions given by the district court on McIntosh's defense were virtually identical to those it gave for Lopez. Specifically, the district judge stated:

Even if you find Ms. Lopez guilty of an escape, you must decide whether the acts charged against Mr. McIntosh ... were justified by necessity or duress. His acts may be justified even if Ms. Lopez is guilty of escape.

The four elements of Mr. McIntosh's necessity defense as to count two, assisting escape, are as follows:

One, Mr. McIntosh believed that the threat or threats to Ms. Lopez were immediate and involved death or serious bodily injury;

Two, Mr. McIntosh's fear for Ms. Lopez's safety was well-grounded. This means that Mr. McIntosh had a good faith belief in the imminence and severity of the threats to Ms. Lopez, and the belief must also have been objectively reasonable;

Three, there was no reasonable and legal alternative to violating the law;

and Fourth, Ms. Lopez made a bona fide good faith effort to surrender to authorities after she reached a position of safety.

. . . .

If the government proves one of those elements is not present, then the defendant[ ] no longer [has] the necessity defense. It's no longer there.[6]

Under this approach, the necessity defense was unavailable to McIntosh unless Lopez made a bona fide effort to surrender to the authorities once she reached a position of safety. McIntosh contends that proof of this surrender element is only required when a defendant is charged with escape. He further argues that the district court's inclusion of the element in his necessity defense was improper because it made his guilt or innocence dependent upon the actions of another. The district judge, however, rejected these arguments, instructing the jury as indicated. We consider jury instructions as a whole to determine if they are misleading or inadequate. *United States v. Beltran–Rios*, 878 F.2d 1208, 1214 (9th Cir.1989). We review an instruction's legal content *de novo. See Collins*, 841 F.2d at 340; *Poling*, 829 F.2d at 885.

The Supreme Court made clear in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), that individuals charged with escape cannot successfully plead necessity unless they can justify their continued absence from custody by offering evidence that they made a bona fide effort to surrender to the authorities. *Id.* at 412–13, 100 S.Ct. at 635–36. The reason for this rule is that escape as defined by 18 U.S.C. § 751 is a continuing offense and therefore "an escapee can be held liable for failure to return to custody as well as for his initial departure." *Id.* at 413, 100 S.Ct. at 636.

In an opinion filed after this trial, we held that aiding escape, unlike escape itself, is not a continuing offense. *See United States v. Vowiell*, 869 F.2d 1264, 1268–

69 (9th Cir.1989). McIntosh's initial assistance to Lopez' escape does not continue as long as Lopez continues to escape, but rather only so long as he continues to assist her in escaping. McIntosh can only be held responsible for his actions, not Lopez'. Thus, if Lopez did not make a good-faith effort to surrender after she reached a position of safety, this would not affect McIntosh's necessity defense, unless he assisted her escape after that time. The fourth element of the instruction erroneously focuses on Lopez' actions rather than McIntosh's. A more appropriate instruction would have informed the jury that the necessity defense was unavailable to McIntosh if, after Lopez reached a position of safety and failed to make bona fide efforts to surrender, he continued to aid her.

The focus of the jury's inquiry should not have been on whether Lopez made a good faith effort to surrender, but rather on whether McIntosh ceased aiding her. Judge Sneed's opinion concludes the error was harmless because the evidence is overwhelming that McIntosh had not "disassociated himself in any way from the failure of Lopez to make a good faith effort to surrender after reaching safety." Presumably this means overwhelming evidence that he continued to aid her in escaping. Judge Sneed's opinion relies on the concurring opinion of Justice Scalia in *Carella v. California*, —— U.S. ——, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989). Preliminarily it should be noted that Justice Scalia's opinion sought to define, with greater particularity than had the majority, the limits of harmless error analysis. Also, that case dealt with whether the erroneous application of a conclusive presumption could be overlooked because the underlying facts the jury would had to have found in order to apply the presumption were so conclusive as to establish the element of the crime without applying the presumption. The language in Justice Scalia's opinion used does not really fit this case because there is no presumption being applied.

6. The jury was also instructed that necessity was available to McIntosh as a defense to the air piracy and gun charges. However, only the first three elements had to be proved to establish the defense as to those counts. Since McIntosh's challenge on appeal is directed solely toward the fourth element, only the assisting escape charge is at issue here.

The concept that Justice Scalia was applying is important, however—if we can really point to facts that the *jury found* that establish the point in issue, then an erroneous instruction can be harmless. That is not the case here. The jury was not asked to make a finding of whether McIntosh continued to aid Lopez after she reached a position of safety. Furthermore, even if the jury had found he ceased aiding her, the jury could have found the defense inapplicable solely based on Lopez' conduct. Judge Sneed's opinion must stand solely on the basis that the evidence McIntosh continued to aid Lopez was overwhelming. This has no relation to Justice Scalia's message in *Carella.* In this case, there having been sufficient evidence to submit the necessity defense to the jury, it became a jury question. Following Justice Scalia's approach, we can overlook an erroneous instruction only if we can point to what the *jury found* not what we as *appellate judges find.*

Because the jury was allowed to find the necessity defense inapplicable, based solely on Lopez' conduct, and because we have no basis for concluding that the jury found McIntosh continued to aid Lopez, I cannot find the error harmless. I would reverse the conviction for aiding escape. The majority of the panel, however, concludes the error is harmless and affirms the conviction.

### III.

### *LESSER INCLUDED OFFENSES*

■ Federal Rule of Criminal Procedure 31(c) provides that a "defendant may be found guilty of an offense necessarily included in the offense charged." McIntosh next claims that the district court improperly refused to apprise the jury of the existence of lesser included offenses to the air piracy charge for which he was convicted. Whether one offense is "necessarily included" in another, and therefore appropriately the subject of a lesser included offense instruction, is a mixed question of law and fact reviewed *de novo* by this court. *See United States v. Komisaruk,* 874 F.2d 686, 694 (9th Cir.1989); *United States v. Brown,* 761 F.2d 1272, 1278 (9th Cir.1985).

This circuit has previously held that a lesser included offense is one that possesses an "inherent relationship" to the greater crime charged. *See United States v. Johnson,* 637 F.2d 1224, 1236–38 (9th Cir.1980). An inherent relationship exists whenever two crimes "relate to protection of the same interests, and [are] so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense." *Komisaruk,* 874 F.2d at 694 (citation omitted). Other circuits, in contrast, have adopted a more mechanistic "elements" test whereby one offense is necessarily included within another only when the elements of the alleged lesser offense form a subset of the elements of the greater offense. *See, e.g., Government of the Virgin Islands v. Joseph,* 765 F.2d 394, 396 (3d Cir.1985); *United States v. Campbell,* 652 F.2d 760, 761–62 (8th Cir.1981).

■ The Supreme Court recently resolved this intercircuit conflict in *Schmuck v. United States,* — U.S. —, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989). The Court in *Schmuck* expressly rejected the inherent relationship approach in favor of the elements test, stating: "[w]here the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." *Id.* 109 S.Ct. at 1450. In addition, the Court indicated that its decision was not meant to alter the independent prerequisite for a lesser included offense instruction that the evidence at trial be such that a rational jury could find the defendant guilty of the included offense but innocent of the greater crime. *Id.* at 1450 n. 8 (citing *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995–96, 36 L.Ed.2d 844 (1973)). Thus, applying the test announced in *Schmuck,* McIntosh can demonstrate that he was entitled to a lesser included offense instruction only if he can establish (1) that the elements of the alleged lesser offense constitute a subset of the elements of the crime charged, and (2) that, given the evidence adduced at trial, a rational jury could

find him guilty of the lesser offense, yet acquit him of the greater.

According to McIntosh, the district court erred in refusing to instruct the jury that theft and flying without a pilot's certificate are lesser included offenses of air piracy.[7] Congress has defined air piracy as "any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States." 49 U.S.C.App. § 1472(i)(2) (1982). An aircraft is deemed to be within the special aircraft jurisdiction of the United States "while that aircraft is in flight, which is from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation." 49 U.S.C.App. § 1301(38) (Supp. II 1984).

It is clear, then, that an individual can be convicted of air piracy for asserting control over an aircraft by force or threat of force even though the aircraft was never moved anywhere. Theft, in contrast, is defined as the unlawful taking *and carrying away* of property. *See* 18 U.S.C. § 661 (1982); *see also United States v. Stearns*, 550 F.2d 1167, 1172 (9th Cir.1977). Thus, it possesses an asportation element that need not be proved in the air piracy context. Similarly, although failure to possess a pilot's certificate is the gravamen of a flying without a license claim, possession of certification to pilot an aircraft is totally irrelevant to the charge of air piracy. Since both theft and flying without a pilot's certificate possess an element foreign to the crime of air piracy, they cannot be deemed "necessarily included in the crime charged." The district court did not err in refusing McIntosh's lesser included offense instructions.

---

7. Any person who, "within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another" is guilty of theft. *See* 18 U.S.C. § 661 (1982). Section 661 is also applicable when the crime takes place aboard an aircraft within the special aircraft jurisdiction of the United States. *See* 49 U.S.C.App. § 1472(k)(1) (1982).

## IV.

### SCOPE OF CROSS–EXAMINATION

McIntosh's final allegation on appeal is that the district court impermissibly limited the scope of the defense's cross-examination of Peter Szabo, the pilot of the helicopter. Szabo testified at trial that McIntosh, using the alias Fred Holbrick, chartered a helicopter on November 5, 1986, ostensibly to view some land he was interested in purchasing. Szabo further testified that, while the two men were in the air, McIntosh pointed a gun at him and ordered him to land. After Szabo landed the helicopter, McIntosh forced him to disembark and then flew away without him.

On cross-examination, McIntosh's attorney attempted to discredit Szabo in a number of ways. He emphasized, for instance, that Szabo was party to a civil lawsuit filed against McIntosh by Szabo's employer. Thus, Szabo arguably had a financial interest in McIntosh's conviction. McIntosh's counsel further attempted to discredit Szabo by identifying inconsistencies between his testimony at trial and prior statements made to law enforcement officials. Finally, the defense suggested through cross-examination that McIntosh never threatened Szabo with a gun, but instead bribed him to land the aircraft.

The district court balked, however, when the defense attempted to elicit from Szabo an admission that he became very upset approximately five months after the helicopter incident when he learned that McIntosh had taken and passed a polygraph examination. Sustaining the prosecution's objection, the district judge refused to allow inquiry into the circumstances surrounding the polygraph. The trial judge had already held the polygraph results inadmissible as direct evidence after concluding that their probative value was out-

---

Pursuant to 14 C.F.R. § 61.3(a) (1988), "[n]o person may act as a pilot in command or in any other capacity as a required pilot flight crew member of a civil aircraft of United States registry unless he has in his personal possession a current pilot certificate."

weighed by the possibility of prejudice. After reiterating this holding in the impeachment context, he concluded as well that the evidence was irrelevant to the cross-examination of Szabo and pertained to an inadmissible collateral matter. We review a district court's regulation of cross-examination for abuse of discretion. *See United States v. Feldman,* 788 F.2d 544, 554 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

The sixth amendment guarantees the accused in a criminal trial the right to cross-examine adverse witnesses. *See United States v. Domina,* 784 F.2d 1361, 1365 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). This right is especially important when the testimony of a key government witness is at issue. *See United States v. Whitworth,* 856 F.2d 1268, 1284 (9th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989). It is never, however, absolute. Rather, it "is subject to the broad discretion of a trial judge to preclude harassment or unduly prejudicial interrogation," *see Domina,* 784 F.2d at 1365, or inquiry into matters that are irrelevant, *see United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). "When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness." *See Kennedy,* 714 F.2d at 973.

▬ Our review of the record in the present case convinces us that the district court did not abuse its discretion in curtailing the cross-examination of Szabo. The defense was permitted substantial latitude in its cross-examination of the helicopter pilot and was able to suggest several reasons why his testimony might be untrustworthy. Furthermore, we have previously held that polygraph evidence is inadmissible as direct evidence absent stipulation by the parties. *See Brown v. Darcy,* 783 F.2d 1389 (9th Cir.1986). We adopted this rule because polygraph examinations are of questionable accuracy and admission of their results at trial is potentially highly prejudicial, consumes large amounts of time, and infringes on the jury's role in determining credibility. *Id.* at 1394–97. Even when polygraph evidence is not offered for its truth, it should not be admitted unless "the probative value of the polygraph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence." *United States v. Miller,* 874 F.2d 1255, 1261 (9th Cir.1989) (quoting *Brown,* 783 F.2d at 1397 n. 14) (other citation omitted).

In this case, allowing cross-examination concerning Szabo's reaction to McIntosh's polygraph results would open the door to testimony regarding the circumstances of the polygraph examination and the results, and would lead to the inference that McIntosh had passed the polygraph test. Thus, many of the same concerns would be present that are sought to be avoided in excluding evidence of polygraph results as direct evidence. Given the generally suspect nature of polygraph evidence and the otherwise wide ranging cross-examination of Szabo that was permitted by the trial judge, the district court's decision to exclude reference to the polygraph was not an abuse of discretion.

## V.

### CONCLUSION

The district court's instructions to the jury on Lopez' necessity defense were proper, and Lopez' conviction is therefore affirmed. Although we conclude that McIntosh's necessity instructions were defective, the majority of the panel, as reflected in Judge Sneed's opinion, finds the error was harmless and therefore does not require reversal of McIntosh's conviction for aiding Lopez' escape. We conclude that McIntosh's other arguments on appeal are without merit. McIntosh's convictions are affirmed in all respects.

AFFIRMED.

CHOY and SNEED, Circuit Judges, concurring in part and delivering the opinion of the court in part:

We readily concur in the court's opinion in all respects save the reversal of McIntosh's conviction for aiding escape.

We acknowledge that our decision in *United States v. Vowiell,* 869 F.2d 1264, 1268–69 (9th Cir.1989), rendered erroneous the fourth element of the jury instruction applicable to the charge of aiding the escape of Lopez. We would hold, however, that the error was harmless.

The missing element in the charge, designed to fix the elements of McIntosh's necessity defense, is the requirement that McIntosh continued to assist Lopez during the entire period of her escape. Put another way, the charge failed to indicate that if Lopez failed to make a bona fide good faith effort to surrender to authorities after she reached a position of safety, McIntosh must be found to have assisted her in this failure. That is, the fourth element properly should have read:

> And Fourth, Should Ms. Lopez not have made a bona fide good faith effort to surrender to authorities after she reached a position of safety, Mr. McIntosh should not have aided or assisted Ms. Lopez in this failure to any extent.

The record contains not a shred of evidence suggesting that McIntosh disassociated himself in any way from the failure of Lopez to make a good faith effort to surrender after reaching safety. Moreover, it was found by the jury that Lopez did so fail. McIntosh was apprehended in a jewelry store while picking up two wedding rings. When he was arrested, police found two guns, ammunition, and $1800 in cash in his briefcase. In addition, police found yet another gun in McIntosh's car as well as a CB radio and a police scanner tuned to monitor police broadcasts. The natural inference of the facts is that McIntosh did assist Lopez in her failure to make a good faith effort to surrender after reaching safety.

Under these circumstances, we follow Justice Scalia's recent description of harmless error. In *Carella v. California,* — U.S. ——, 109 S.Ct. 2419, 2433, 105 L.Ed.2d 218 (1989), joined by Justices Brennan, Marshall, and Blackmun, he said:

> When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed. The error is harmless because it is "beyond a reasonable doubt," *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), that the jury found the facts necessary to support the conviction.

109 S.Ct. at 2433.

Here the "predicate fact ... necessarily found by the jury" was the failure of Lopez to make the required good faith effort to surrender. The "ultimate fact to be presumed" is McIntosh's assistance in this failure. We would hold no rational jury under the facts of this case could find the first without finding the second. The error in the charge was harmless beyond a reasonable doubt.