PD-1499-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/18/2015 10:02:33 AM
Accepted 11/18/2015 3:16:00 PM
ABEL ACOSTA
CLERK

**IN THE**
**TEXAS COURT OF CRIMINAL APPEALS**

AROLDO HUMBERTO CADRIEL,

      Petitioner,

vs.                        No. _____

THE STATE OF TEXAS,

      Respondent.

---

# PETITION FOR DISCRETIONARY REVIEW

---

McDermott Will & Emery

Michael J. Wynne
TX Bar No. 00785289
McDermott Will & Emery
1000 Louisiana Street, Suite 3900
Houston, TX 77002
Tel: (713) 653-1700
Fax: (713)739-7592
Email: mwynne@mwe.com

**ATTORNEY FOR PETITIONER**

FILED IN
COURT OF CRIMINAL APPEALS

November 18, 2015

ABEL ACOSTA, CLERK

**PETITIONER REQUESTS ORAL ARGUMENT**

**IDENTITY OF JUDGE, PARTIES, AND COUNSEL**

Pursuant to Tex. R. App. P. 68.4(a), the list of the trial court judge, all parties to the judgment or order appealed from, and the names and addresses of all trial and appellate counsel is as follows:

Trial Judge: Elia Cornejo-Lopez; 404th District Court of Cameron County, Texas

Final Judgment entered by Judge Marisela Saldana.

Parties: State of Texas

Aroldo Humberto Cadriel

Trial counsel – for the defense:  Nat Perez, Jr., 847 E. Harrison Street, Brownsville, Texas  78520

Appellate counsel – for the defense:  Philip T. Cowen, 500 E. Levee Street, Brownsville, Texas  78520

Trial counsel for the State of Texas:  Korina Barraza, Arturo Teniente and Brett Pattillo, Assistant District Attorneys, , Office of Hon. Luis Saenz, District and County Attorney for Cameron County, Texas, 964 E. Harrison Street, Brownsville, Texas  78520-7123

**TABLE OF CONTENTS**

                                                                    **Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................1

STATEMENT OF THE CASE...................................................................................1

STATEMENT OF PROCEDURAL HISTORY .....................................................2

ABBREVIATIONS AND REFERENCES ...............................................................2

GROUNDS FOR REVIEW ......................................................................................2

ARGUMENT ...........................................................................................................4

    **1.   The Court of Appeals Erred in Finding Probable Cause Would Still
Exist on Excising from the Affidavit Illegally-Obtained Cell Phone Records
and in Wrongly Sanctioning the Trial Court's Knee-Jerk Sacking of
Appellant's Suppression Motion.** ....................................................................4

    **2.   The Court of Appeals failed with care to examine the trial court's failure
seriously to consider competency**. ..................................................................11

PRAYER FOR RELIEF .........................................................................................13

CERTIFICATE OF SERVICE ...............................................................................15

CERTIFICATE OF COMPLIANCE......................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blasdell v. State*,
    384 S.W.3d 824 (Tex. Crim. App. 2012) ..........................................................10

*Crosby v. State*,
    750 S.W.2d 768 (Tex. Crim. App. 1987) ............................................................4

*Illinois v. Gates*,
    462 U.S. 213 (1983) ...........................................................................................5

*Ex parte LaHood*,
    401 S.W.3d 45, 52–53 (Tex. Crim. App. 2013) ................................................12

*Miles v. State*,
    241 S.W.3d 28 (Tex. Crim. App. 2007) ..............................................................8

*Morris v. State*,
    301 S.W.3d 281, 299 (Tex. Crim. App. 2009) ..................................................11

*Rodriguez v. State*,
    232 S.W.3d 55 (Tex. Crim. App. 2007) ..............................................................5

*Tillman v. State*,
    354 S.W.3d 425 (Tex. Crim. App. 2011) ..........................................................10

*Turner v. State*,
    422 S.W.3d 676 (Tex. Crim. App. 2013) ....................................................11, 12

*Turribiate v. State*,
    399 S.W.3d 147 (Tex. Ct. Crim. App. 2013) ......................................................7

*United States v. Wade*,
    388 U.S. 218 ........................................................................................................9

*Wilson v. State*,
    311 S.W.3d 452 (Tex. Crim. App. 2010) ............................................................8

*Wong Sun v. United States*,
    371 U.S. 471 (1963).............................................................................................4

iv

**Statutes**

18 U.S.C. § 2702 ...............................................................................................5, 6, 7

Tex. Code Crim. Proc. Ann. art. 46B.003(a)(1),(2) (West 2006)............................11

Tex. Code Crim. Proc. Ann. art. 46B.004(b) and 46B.004(c)................................11

Tex. Code Crim. Proc. arts. 46B.005 & 46B.021(b) ................................................12

Tex. Crim. Proc. Code Ann. § art. 38.23 ................................................................8

**Constitutional Provisions**

Tex. R. App. P. 68.4(a) ....................................................................................... ii

U.S. Const. Am. IV ......................................................................................*passim*

**Additional Authorities**

http://www.innocenceproject.org/causes-wrongful-
conviction/eyewitness-misidentification .............................................................9

K. L. Pickel, *The Influence of Context on the "Weapon Focus" Effect*
23 L. & Hum. Behav. 299–311  (1999)................................................................9

N. M. Steblay, *A Meta-analytic Review of the Weapon Focus Effect* 16
L. & Hum. Behav. 413–24 (1992)....................................................................10

Saul M. Kassin et al., *On the "General Acceptance" of Eyewitness
Testimony Research: A New Survey of the Experts* 56 Am.
Psychologist 405, 414 (2001). .........................................................................10

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner believes oral argument would be helpful to the Court because some of the issues, including issues relating to the reliability and weight of eyewitness testimony that Petitioner raises are germane to ones recently before the Court and because the public policy matters implicated would be better discussed in the context of oral argument, where the Court can ask questions and consider alternatives, which counsel would be prepared to address.

## STATEMENT OF THE CASE

This case concerns a conviction based primarily on fleeting eye witness testimony, including testimony of a witness who made his observations standing at gunpoint, not unlike the case of Brandon Scott Blasdell v. the State of Texas, PD-0162-14, 10/15/2014.  The Court of Appeals unduly relied on the reports from the eyewitness account summarized in an affidavit supporting a search warrant application for Petitioner's residence to support the trial court's finding probable cause after excising a statement derived from telephone records unlawfully obtained without a search warrant or court order.  The Court of Appeals compounded this error by finding lawful the Petitioner's alleged waiver of his rights to challenge effectively the court's finding of competency and to challenge by expert testimony the state's porous ballistics evidence.

1

## STATEMENT OF PROCEDURAL HISTORY

(1) Date of opinion from the Court of Appeals      September 25, 2015

(2) Date of Motion for Rehearing      October 7, 2015

(3) Date Motion for Rehearing Denied      October 19, 2015

## ABBREVIATIONS AND REFERENCES

The Memorandum Opinion of the Court of Appeals is attached to this petition as an appendix.

The Clerk's Record (CR) is referred to by page number (*e.g.*, CR93).

The Reporter's Record (RR) is referred to by volume number, then page number (*e.g.*, 5 RR 22).

## GROUNDS FOR REVIEW

1. The state's seizure of telephone records without a warrant or court order is a violation of the Fourth Amendment. The records must be suppressed and cannot form the basis for a search warrant application. On review, the Court of Appeals tried to excise the unlawfully obtained records from the search warrant for Petitioner's residence. All that remained to support probable cause was a summary of a couple eyewitnesses' fleeting accounts. One of the purported eyewitnesses saw whoever he saw while at gunpoint seconds

2

before he fled the scene, necessarily rendering dubious the accuracy of any identification. The other, a drug dealer, allegedly encountered the victim with the Petitioner at 2:00 a.m. Because the lower courts refused to suppress evidence obtained upon execution of the search warrant, the conviction must be overturned.

2. The Court of Appeals erred in determining that the trial court conducted a sufficient competency inquiry, as illustrated, among other ways, most tellingly by the Court's approving the trial's court's cursory and casual dismissal of the fact that Petitioner's illogically and inarticulately declined an opportunity to enlist an expert [at no cost] to challenge the state's Sacking questionable ballistics evidence. To suggest that Petitioner at the time he made such a clearly irrational decision had the capacity to determine voluntarily whether he first had the capacity himself to proceed with any such decisions is disingenuous.

## ARGUMENT

**1. The Court of Appeals Erred in Finding Probable Cause Would Still Exist on Excising from the Affidavit Illegally-Obtained Cell Phone Records and in Wrongly Sanctioning the Trial Court's Knee-Jerk Sacking of Appellant's Suppression Motion.**

Petitioner's conviction rested, in large part, on evidence seized pursuant to a search warrant executed at Petitioner's home, specifically, the weapon allegedly connecting Petitioner to the murder. The weapon, however, should never have been introduced into evidence because it was the "fruit of a poisonous tree:" the result of an unlawful search and seizure and procured in violation of Petitioner's Fourth Amendment rights. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Crosby v. State*, 750 S.W.2d 768, 780 (Tex. Crim. App. 1987). Probable cause for the warrant to search Petitioner's home was based on the review of Petitioner's cell phone records, which were unlawfully obtained, as described more fully below. Because the search warrant used to enter Petitioner's home was constitutionally defective and invalid on its face, the Texas exclusionary rule dictates that all evidence derived from this illegal search and seizure should have been suppressed. Without the weapon seized as a result of this invalid warrant, the State had insufficient evidence to convict Petitioner. The Court's failure to suppress this evidence compels more thorough analysis to ensure justice has been done in such a painfully consequential case.

4

The cornerstone of the Fourth Amendment is that a search warrant may not be issued without a finding of "probable cause" that a particular item will be found at a particular location. *See Rodriguez v. State,* 232 S.W.3d 55, 60 (Tex. Crim. App. 2007). Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a "fair probability" or "substantial chance" that contraband or evidence of a crime will be found at the specified location. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). In this instance case, probable cause for the warrant to search Petitioner's home rested on two factors: (1) Petitioner's cell phone records from his wireless provider, Cricket, placing him in the victim's vicinity, and (2) eyewitness testimony regarding Petitioner's whereabouts. Each of these factors is discussed below.

With respect to the first factor, Petitioner's cell phone records were unlawfully obtained and therefore cannot form the basis for probable cause. It is undisputed that the government did not obtain a warrant or court order to obtain Petitioner's cell phone records, in clear violation of Petitioner's statutory and constitutional rights. *See* 18 U.S.C. § 2702(c)(1). No exigent circumstances justify the government's failure to secure a warrant and therefore the unlawfully-obtained cell phone records cannot form the basis for probable cause. The murder had already occurred, the body had already been found, and the number of bullets fired indicated that whoever committed the act clearly intended to attack a specific

person. The state's given rationalization for "exigent circumstances," that once a person has killed, he or she may kill again is disingenuous and self-serving. *See* 4 RR 35-45. Moreover, Appellant had voluntarily come to the police station for questioning, and they had let him leave, belying any suggestion that he was dangerous to the community at large. *Id.* The state's explanation for letting him go and out of the same mouth claiming that an exigent threat existed to the community at large, rationalizing an unadorned contempt for the Fourth Amendment, *id.*, – that it had no suspect -- is whimsical. Such an unwieldy and convenient exception to the warrant requirement, if embraced any more widely, would swallow the structural, cherished, and sacred Fourth Amendment warrant requirement.

Under the Stored Communications Act ("SCA"), a provider may disclose customer records (including cell phone records) without a court order or a warrant in emergency situations. 18 U.S.C. § 2702 sets forth the general rule that "electronic communication service to the public shall not knowingly divulge" the contents of a communication. The statute, however, provides an exception for disclosure of customer records to a governmental entity "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the

emergency." *Id.* at § 2702(c)(4). Here, there was no such emergency, and the state's warrantless procurement of the phone records was unlawful.

The State secured Petitioner's phone records from Petitioner's wireless provider, Cricket, by submitting an exigent circumstances form, ostensibly in compliance with 18 U.S.C. § 2702(c)(4). By submitting this form, the State vouchsafed that there was an emergency involving a danger of death or serious physical injury to a person requiring disclosure without delay of communications related to the emergency, and that the emergency justified disclosure of phone records without a warrant or court order. However, the facts of this case belie the contention that any exigent circumstance existed.

Exigent circumstances usually involve an increased likelihood of apprehending a suspect, danger to the victim or police, or the possible destruction of evidence. *See Turribiate v. State,* 399 S.W.3d 147, 151 (Tex. Ct. Crim. App. 2013) (addressing the law applicable to warrantless entry and acknowledging that a warrantless entry into a residence is presumptively unreasonable). As previously discussed, none of these circumstances apply here. The State's rote "compliance" with the pro forma requirements of 18 U.S.C. 2702(c)(4) are insufficient to pass statutory or constitutional muster. Again, if exigent circumstances were to exist simply because it is expedient for the state to claim they do, the exigent

7

circumstances exception swallows the rule and the protection afforded by the warrant requirement is illusory.

Texas's broadly-worded exclusionary rule, which is enshrined in statute, compels exclusion of any evidence resulting from the wrongfully-obtained warrant. Tex. Crim. Proc. Code Ann. § art. 38.23 requires exclusion of "evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the state of Texas, or of the Constitution or laws of the United States of America . . . evidence against the accused [in] any criminal case." Article 38.23, like its federal counterpart, seeks to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement *Wilson v. State*, 311 S.W.3d 452, 458–59 (Tex. Crim. App. 2010). The Texas rule also prohibits evidence obtained through an illegal act. *Id.*; *see also Miles v. State*, 241 S.W.3d 28, 36 (Tex. Crim. App. 2007). (holding that exclusionary rule applied to confession obtained after showing murder suspect a forged lab report purporting to show a match between suspect's fingerprints and those found on the alleged murder weapon). The Texas rule further applies to evidence illegally obtained by private citizens, "even when those [private citizens] are not acting in conjunction with, or at the request of, government officials." *Miles*, 241 S.W.3d at 36. The broad protections afforded by the Texas exclusionary rule make plain that reliance

8

on evidence secured in violation of a defendant's constitutional and statutory rights is disfavored strongly.

After this constitutionally-defective evidence—the phone records— is excised, the only remaining evidence against Petitioner is two unreliable eyewitness accounts, which are insufficient to support a finding of probable cause. Courts have long observed the unreliability of expert testimony. *See, e.g., United States v. Wade,* 388 U.S. 218, 228, ("The identification of strangers is proverbially untrustworthy."). Scholars have opined regarding the impact of unreliable eyewitness testimony on the criminal justice system for decades. *See, e.g.,* Woocher, "Do Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Testimony," Stanford Law Review, Vol. 29, No. 5 (May, 1977), pp. 969-1030. More recent studies have suggested that unreliable eyewitness testimony is a hallmark of wrongful convictions "playing a role in nearly 70% of convictions overturned by DNA testing nationwide." http://www.innocenceproject.org/causes-wrongful-conviction/eyewitness-misidentification

One of the eyewitnesses who implicated Petitioner did so at gunpoint. The reliability of this eyewitness identification, when made facing down the barrel of a gun, is exceptionally suspect. *See, e.g, Law and Human Behavior* – K. L. Pickel, *The Influence of Context on the "Weapon Focus" Effect*, 23 L. & Hum. Behav.

9

299–311 (1999); N. M. Steblay, *A Meta-analytic Review of the Weapon Focus Effect*, 16 L. & Hum. Behav. 413–24 (1992). The impact of a weapon on eyewitness identification is known in the scholarship as "the weapon focus effect." *See id.* As one expert witness explained to this Court, "weapon focus effect," is "a tendency, when there is a weapon involved, particularly in brief encounters, for the weapon to essentially attract attention away from the perpetrator's face and, by doing so, result in lesser accuracy for the identification." *Blasdell v. State*, 384 S.W.3d 824, 827–28 (Tex. Crim. App. 2012). Such testimony is, under the appropriate set of facts, relevant to a jury as required by the state's version of Fed. R. Civ. P. 702. *Id.* at 831; Tex. R. Evid. Rule 702. This Court has also acknowledged a 2001 survey in which seventy to eighty-seven percent of surveyed experts found research on the topic of "weapon focus" to be reliable. *Tillman v. State*, 354 S.W.3d 425, 437 (Tex. Crim. App. 2011) (citing *New Jersey v. Henderson*, 208 N.J. 208, 27 A.3d 872 (2011)); *see also* Saul M. Kassin et al., *On the "General Acceptance" of Eyewitness Testimony Research: A New Survey of the Experts*, 56 Am. Psychologist 405, 414 (2001). This inherently defective eyewitness testimony upon which the warrant is based—and failure to safeguard Petitioner's Fourth Amendment rights-- compel rehearing to reverse his conviction.

10

**2. The Court of Appeals failed with care to examine the trial court's failure seriously to consider competency**.

Petitioner's conviction should also be reversed because he was incompetent to stand trial. The prosecution and conviction of a defendant if he is legally incompetent violates due process. *Morris v. State,* 301 S.W.3d 281, 299 (Tex. Crim. App. 2009). To protect a defendant's constitutional and statutory rights, a trial court *must* inquire into the defendant's mental competence once the issue is properly brought to the court's attention. *See Turner v. State,* 422 S.W.3d 676, 689 (Tex. Crim. App. 2013). A defendant is incompetent to stand trial if he does not have "sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against" him. Tex. Code Crim. Proc. Ann. art. 46B.003(a)(1),(2) (West 2006); *See also* Turner, 422 S.W.3d at 682-83 (evaluating whether Defendant had a rational and factual understanding of the proceeding against him). If evidence suggesting a defendant's incompetence comes to the trial court's attention, the court must determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. *See* Tex. Code Crim. Proc. Ann. art. 46B.004(b) and 46B.004(c). A mere suggestion of incompetency is the threshold requirement for an informal inquiry . . . ." *Id.* art. 46B.004(c-1 ).

11

In conducting its informal inquiry, a trial court must consider only the evidence tending to show incompetency, "putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency." *Ex parte LaHood,* 401 S.W.3d 45, 52–53 (Tex. Crim. App. 2013). If, after its informal inquiry, the trial court determines that evidence exists to support a finding of incompetency, the statutory scheme requires the trial court to conduct a formal competency trial. *Turner,* 422 S.W.3d at 692; Tex. Code Crim. Proc. arts. 46B.005 & 46B.021(b).

Although the informal inquiry need not be exhaustive, the cursory glance at the issue in this case was manifestly insufficient. Petitioner's decision to decline to enlist a ballistics expert—at no cost to him--to evaluate ballistics evidence calls into question his ability to rationally and factually understand the allegations against him. Under oath, Petitioner told the Court, in response to the Court's question, that he had three issues with retaining a ballistics expert, but he declined to elaborate on those reasons stating "I just want to move on." 3 RR 26. The Court then asked Petitioner, at counsel's suggestion, whether he desired to decline testing or examination concerning his mental capacity, insanity, or diminished capacity, Petitioner with hesitation said, "Yes, Your Honor. That my – that's and there are several reasons behind it." 3 RR 27.

12

The record reflects a bench conference, during which Petitioner was instructed to confer with his attorney for "two or three minutes." Nothing on the record, however, shows any inquiry into whether Petitioner understood the consequences of declining a mental health evaluation. *See* 3 RR 27-28. Nor did the Court formally confirm with Counsel that Counsel believed that Petitioner understood the proceedings and was able to assist in his own defense.

The Court was aware of Petitioner's disorders, including his bipolar disorder, but simply took Petitioner's word for it that he was "okay." By definition, he was not. At the very least, the Court had an obligation to address the three issues the Petitioner twice mentioned but was not allowed the opportunity to identify and explain on the record. While this rush to move along may have been expedient for the Court and counsel, the informal inquiry was not sufficient to demonstrate Petitioner's competency. As such, it fails satisfy the very basic constitutional protections afforded by the Constitution and Texas statute, and warrants remand.

**PRAYER FOR RELIEF**

Petitioner requests that the Court of Criminal Appeals to grant this petition for discretionary review. Petitioner also requests that this Court order all evidence seized from the search of his residence be suppressed. Consequently, Petitioner

13

requests that this Court reverse his conviction direct the lower courts to enter a judgment of acquittal ordered.  In the alternative, Petitioner requests that this Court remand for a new trial.

Petitioner also requests such other and further relief to which he may be entitled.

Respectfully submitted,

/s/  Michael J. Wynne

Michael J. Wynne
TX Bar No. 00785289
McDermott Will & Emery
1000 Louisiana Street, Suite 3900
Houston, TX  77002
Tel:  (713) 653-1700
Fax:  (713)739-7592
Email:  mwynne@mwe.com

**ATTORNEY FOR PETITIONER**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2015, a copy of the foregoing Petition for Discretionary Review was served on the following by certified mail, return receipt requested:


Rene B. Gonzalez, Esq.
Cameron County District Attorney's Office
4th Floor
964 E. Harrison Street
Brownsville, TX 78520-7123


Court of Criminal Appeals
P.O. Box 12308
Austin, Texas  78711


/s/  Michael J. Wynne

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Petition for Discretionary Review conforms to the requirement of Texas Rule of Appellate Procedure 9 and consists of less than 4,500 words, that is 3527 words, per Texas Rule of Appellate Procedure 9.4(i)(2)(D).


/s/  Michael J. Wynne

16

## IN THE
## TEXAS COURT OF CRIMINAL APPEALS

AROLDO HUMBERTO CADRIEL,

     Petitioner,

vs.                                                     No. _____

THE STATE OF TEXAS,

     Respondent.

---

# APPENDIX -
# PETITION FOR DISCRETIONARY REVIEW

---

**Index:**

1 – 26      Court of Appeals Opinion dated September 24, 2015



# NUMBER 13-14-00137-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

AROLDO HUMBERTO CADRIEL,                                    Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

On appeal from the 404th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Longoria
### Memorandum Opinion by Justice Rodriguez

A jury found appellant Aroldo Humberto Cadriel guilty of murder by shooting Brisna

Mireles with a firearm.[1]  *See* Tex. Penal Code Ann. § 19.02(b) (West, Westlaw through

---

[1] As this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.4.

2015 R.S.). The trial court sentenced him to life in the Texas Department of Criminal Justice–Institutional Division. By six issues, Cadriel contends: (1) the trial court erred in refusing to recuse or disqualify the District Attorney who magistrated Cadriel; (2) the trial court abused its discretion when it did not, *sua sponte*, conduct an informal inquiry into his competency; (3) the trial court erred in denying his motion to suppress because probable cause to support a search warrant was based on illegal or "tainted" information; (4) the trial court abused its discretion when it admitted the State's ballistics expert's testimony because it was unreliable; (5) the trial court erred in failing to grant a mistrial because of the "many times that defense counsel's motion in limine was violated"; and (6) the State violated his due process rights and the trial court erred in not granting a mistrial when the State did not produce a video statement. We affirm.

## I. Recusal or Disqualification of the District Attorney

By his first issue, Cadriel contends that the trial court erred when it denied his motion to recuse or to disqualify Cameron County District Attorney Luis V. Saenz because he "magistrated" Cadriel on the day he was arrested.[2]

### A. Cadriel's Motion, the State's Response, and the Trial Court's Ruling

In his motion to recuse or disqualify the district attorney, Cadriel set out the following undisputed facts: (1) Cadriel was charged with a murder that occurred on or about March 31, 2012; (2) he was arrested on April 12, 2012: (3) Cadriel was booked into the Cameron County jail and arraigned; (4) Saenz magistrated Cadriel; and (5) after being

---

[2] The duties of a magistrate are set out in article 15.17 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art 15.17 (West, Westlaw through 2015 R.S.).

2

elected District and County Attorney for Cameron County, Saenz was Cadriel's prosecuting attorney. Cadriel argued that Saenz should have recused himself because "Saenz is conflicted from now prosecuting a defendant over whom he presided over [sic] at the defendant's magistration, as a Judge." He also asserted that the trial court should disqualify Saenz because he would be a material witness in his case, testifying on his behalf regarding "(1) if the defendant was magistrated; (2) was the defendant advised of his *Miranda* warning rights; (3) whether the defendant stated he understood those rights and if it appeared that he understood those rights; (4) and any and all other matters that may relate[ ] to defendant's magistration."

The State responded, arguing that Saenz "ha[d] chosen not to recuse himself or the District Attorney's Office" because no conflict of interest existed. And Cadriel alleged only a perceived possibility of a conflict of interest—that Saenz was a material witness who could be called to testify as to the magistration of Cadriel. *See Gilbert McClure Enters. v. Burnett*, 735 S.W.2d 309, 311 (Tex. App.—Dallas 1987, orig. proceeding) (stating that disqualification is not appropriate when opposing counsel merely announces his intention to call the attorney as a fact witness; there must be a genuine need for the attorney's testimony that is material to the opponent's client). The State also argued that Cadriel presented no evidence that Saenz's contemplated testimony on the issue of Cadriel's initial arraignment was necessary and that it went to an essential fact in the case. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Tex. State Bar R., art. X, § 9) (providing that, with exceptions that do not apply in this case, "[a] lawyer shall not accept or continue employment as an

3

advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client"). Finally, the State agreed to stipulate to the following: (1) Saenz magistrated Cadriel; (2) Cadriel was advised of his rights; (3) Cadriel did not make any statement of which the State was aware either during the initial arraignment hearing before the magistrate or since magistration; and (4) the hearing was estimated to have taken no more than three or four minutes.

After hearing the parties' arguments, the trial court denied Cadriel's motion. However, because the ruling allowed for the Cameron County District Attorney's continued prosecution of Cadriel, the trial court informed Cadriel that it "left the door open" should he feel compelled to reurge recusal or disqualification. Cadriel did not reurge his motion during the trial, and neither the State nor Cadriel called Saenz as a witness.

## B.   Applicable Law and Standard of Review

"[T]he district attorney must initiate his own recusal." *State of Tex. ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 939 (Tex. Crim. App. 1994) (en banc). "A prosecutor's refusal to recuse himself from the case cannot be corrected because the trial court has no authority to force a recusal." *Johnson v. State*, 169 S.W.3d 223, 229 (Tex. Crim. App. 2005). However, when a prosecutor refuses to voluntarily recuse himself, the trial court may disqualify the prosecutor, but *only* when the disqualification is based on a conflict of interest that rises to the level of a due-process violation. *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana*, 236 S.W.3d 207, 211 n.15 (Tex. Crim. App. 2007) (orig. proceeding); *Pirtle*, 887 S.W.2d at 927 (same). Reflective of such conflicts

4

are certain statutory provisions under which the trial court can disqualify the prosecutor. For example, the court may disqualify the prosecutor for being previously employed adversely to the State in the pending matter. *See* TEX. CODE CRIM. PROC. ANN. art. 2.01 (West, Westlaw through 2015 R.S.); *Landers v. State*, 256 S.W.3d 295, 297–310 (Tex. Crim. App. 2008) (concluding that the trial court did not abuse its discretion when it denied the defense's motion to disqualify a prosecutor who had represented the defendant in a prior alcohol-related offense that was similar to, but not the same, as the pending charge). And it may disqualify the prosecutor for instances of incompetency, official misconduct, or intoxication. *See* TEX. LOC. GOV'T CODE ANN. § 87.013 (West, Westlaw through 2015 R.S.).

Disqualification of counsel is a severe remedy. *See Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding). In order to prevent such misuse of the rule as a dilatory trial tactic, the trial court should require the party seeking disqualification to demonstrate actual prejudice to himself resulting from the opposing lawyer's service in the dual roles. *See id.*; *Ayres v. Canales*, 790 S.W.2d 554, 558 (Tex. 1990) (orig. proceeding) (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08 cmt. 10).

We review the trial court's decision of whether to disqualify a prosecutor for an abuse of discretion. *Landers*, 256 S.W.3d at 303. Under that analysis, the trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id.*

5

## C. Discussion

In sum, Cadriel argues that Saenz should have recused himself and that the trial court should have disqualified Saenz because (1) Saenz, as magistrate, and Saenz, as prosecutor, creates a conflict, and (2) being the magistrate made Saenz a witness in this case. We disagree.

Cadriel has not shown actual prejudice from an alleged disciplinary rule violation or any violation of his due-process rights by Saenz serving in dual roles—as his magistrate and then as the prosecuting attorney in this case. *See Spears*, 797 S.W.2d at 656; *Ayres*, 790 S.W.2d at 558; *see also* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08 cmt. 10. The record does not reveal a conflict of interest, if any, that rises to the level of a due-process violation. *See Young*, 236 S.W.3d at 211 n.15; *Pirtle*, 887 S.W.2d at 927 (same). Instead, we agree with the State and conclude that no conflict of interest exists. A perceived or potential conflict is not enough. *See Gilbert McClure Enters.*, 735 S.W.2d at 311. And no statutory grounds for disqualification were shown. Finally, there is no factual basis for a disqualification. Cadriel provides no record citations, and we find none, where the jury heard evidence or even argument concerning Saenz's role as magistrate. Saenz did not testify as a witness; neither the State nor Cadriel called him to testify. Cadriel presented no evidence that Saenz's contemplated testimony on Cadriel's initial arraignment was necessary or that it was material and went to an essential fact in this case. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08(a). Moreover, Cadriel provides no citations to the record, and we find none, to indicate that he made any statement during the initial arraignment hearing that was later used against him at trial.

6

And, among other things, the State stipulated that Cadriel made no statements at the arraignment or subsequent to it.

Based on the above, the trial court's decision did not lie outside the zone of reasonable disagreement, and so we conclude that the trial court did not abuse its discretion. *See Landers*, 256 S.W.3d at 303. We overrule Cadriel's first issue.

## II. INFORMAL INQUIRY INTO CADRIEL'S COMPETENCY

Cadriel argues by his second issue that the trial court abused its discretion by failing to conduct, *sua sponte*, an informal inquiry to determine whether evidence existed to justify a formal competency trial. In response, the State asserts that the trial court conducted an informal competency inquiry, and therefore, the trial court did not abuse its discretion. We agree with the State.

### A. Standard of Review and Applicable Law

This Court reviews a trial court's decision regarding an informal competency inquiry for an abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds as stated in Turner v. State*, 422 S.W.3d 676, 692 n.31 (Tex. Crim. App. 2013); *Jackson v. State*, 391 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.); *see also Luna v. State*, 268 S.W.3d 594, 600 (Tex. Crim. App. 2008). A "person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West, Westlaw through 2015 R.S.). "On suggestion that the defendant may be incompetent to

7

stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." *Id.* art. 46B.004(c) (West, Westlaw through 2015 R.S.). Under the present statute, "[a] suggestion of incompetency is the threshold requirement for an informal inquiry" regarding competency. *Id.* art. 46B.004(c–1); *see Turner*, 422 S.W.3d at 692.

An informal inquiry does not have to be exhaustive. It may be satisfied when the trial court poses simple questions to the defendant and/or defense counsel regarding the defendant's competency. *See generally Luna*, 268 S.W.3d at 598–600; *Jackson*, 391 S.W.3d at 142; *Gray v. State*, 257 S.W.3d 825, 829 (Tex. App.—Texarkana 2008, pet. ref'd); *see also Stevenson v. State*, No. 05-12-01668-CR, 2014 WL 3555767, at *2 (Tex. App.—Dallas July 17, 2014, pet. ref'd) (not designated for publication); *Coyt-Sowells v. State*, No. 14–11–00986–CR, 2013 WL 1499579, at *1 (Tex. App.—Houston [14th Dist.] Apr. 11, 2013, no pet.) (mem. op., not designated for publication).

## B. Discussion

The record in this case shows Cadriel's trial counsel asked to make a record with Cadriel at a pre-trial status hearing. The trial court granted his request. Through counsel's questions and Cadriel's answers, counsel brought to the trial court's attention a disagreement he and Cadriel had regarding counsel's desire to request two expert witnesses, one to investigate the possibility of an insanity defense and another to investigate issues related to ballistics. Cadriel agreed with counsel that he suffered from post-traumatic stress disorder and had been diagnosed with "some bipolar issues." However, when asked if he wished to raise "any kind of an insanity defense, not

8

competent to stand trial defense," or "any kind of diminished capacity" defense, Cadriel responded, "No." Cadriel agreed that he made the decision freely and voluntarily and without pressure. After testifying that he understood that the State would be asked to absorb the cost of any defense expert, Cadriel again agreed that he did not want to raise any type of "mental defense."

Counsel also asked questions of Cadriel about the report prepared by the State's ballistics expert, which concluded that the ballistics tool marking on a fragment of a bullet recovered from the victim matched that of a bullet fired from a handgun attributed to Cadriel. When asked whether he wanted to hire a defense expert to controvert this evidence, Cadriel testified that he wanted "[t]o move on with the trial and not to hire no one." According to his testimony, no one pressured or forced him to make that decision. Although counsel told Cadriel that, without such an expert, it would be hard to controvert the State's evidence, he remained firm in his decision.

After defense counsel concluded his questioning, the trial court posed a series of background questions to Cadriel regarding his incarceration, employment history, income, education, and military experience. The trial court also discussed with Cadriel the importance of matters raised by counsel, including the ballistics and mental competency issues. Cadriel informed the trial court that he based his decision regarding the ballistics expert on more than finances and testified, "there are about three issues pertaining to that. . . . I want to just move on." When the trial court explained to Cadriel that his counsel was also suggesting that the court might want some analysis or testing of Cadriel's mental competence and asked Cadriel if he was saying he did not want to

9

pursue that, he answered, "Yes, Your Honor. That's my—that's my answer and there are several reasons behind it."

Because Cadriel referenced reasons or issues supporting his answers, the trial court asked Cadriel's counsel to talk with Cadriel in private. The court explained that this would give Cadriel an opportunity to discuss those matters with his attorney. Following an off-the-record conference with his client, counsel reported the following to the court: "In speaking with Mr. Cadriel privately in the jury room, Your Honor, with respect to ballistics, requesting our ballistics expert and any kind of a psychiatric expert, Mr. Cadriel continues to insist he does not want either, he wants to proceed forward to trial as soon as possible."

We conclude that the questions asked of Cadriel were sufficient to constitute an informal inquiry into Cadriel's competence. See Luna, 268 S.W.3d at 598–600; Jackson, 391 S.W.3d at 142; Gray, 257 S.W.3d at 829. And, after Cadriel had testified, the trial court specifically gave defense counsel an opportunity to privately discuss with Cadriel his understanding of these matters and his desires. Under these circumstances, the trial court's own observations coupled with its questions to Cadriel and to counsel that related to Cadriel's competency satisfied the requirement of an informal inquiry.[3] The court did not abuse its discretion in doing so. See Montoya, 291 S.W.3d at 426. We overrule Cadriel's second issue.

---

[3] By his second issue, Cadriel complains only that the trial court failed to conduct an informal inquiry. He does not complain in the alternative that if we find the trial court conducted an informal inquiry it should have further conducted a formal inquiry pursuant to article 46B.005. See TEX. CODE CRIM. PROC. ANN. art. 46B.005(a) (West, Westlaw through 2015 R.S.). So that issue is not before the Court. See TEX. R. APP. P. 47.1.

### III. MOTION TO SUPPRESS

By his third issue, Cadriel contends that the trial court erred in denying his motion to suppress evidence seized from his home because probable cause for the search warrant was based on his illegally seized phone records. Cadriel alleges that Special Agent Luther Selby with ICE-Homeland Security Investigations violated section 2702 of the Stored Communications Act (SCA) by requesting the cell phone records without first obtaining a court order or a warrant authorizing the pinging. *See* 18 U.S.C.A. § 2702(a–c) (prohibiting providers from voluntarily disclosing customer records to a governmental entity unless an exception applies). Cadriel contends that the officers were able to determine his whereabouts on the day of the murder through the illegally obtained cell phone records and then included that information in the affidavit used to obtain the search warrant for his residence. Cadriel asserts, that while the cell phone records were not admitted as evidence, what was found in his home during that search and what was admitted as evidence at trial "were the guns seized, one of which was claimed to be the weapon which fired bullet 18A, one of five bullets found in the victim's body." It is the admission of this evidence that Cadriel attempted to suppress.

### A.    Standard of Review and Applicable Law

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give the trial court almost complete deference in its determination of historical facts, especially if they are based on an assessment of

11

credibility and demeanor. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We afford the trial court the same deference in its rulings on the application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Id.* However, for mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Id.*

We view all of the evidence in the light most favorable to the trial court's ruling. *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011). Therefore, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* Since all evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold its ruling on a motion to suppress if that ruling is supported by the record and is correct under any theory of law applicable to the case. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc); *Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

"Probable cause exists where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the specified location." *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When reviewing whether an affidavit for a warrant provided a basis for finding probable cause, this Court does not consider each fact in isolation; rather, we must consider the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (reaffirming "the totality-of-the-circumstances analysis," and

12

setting out that "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed"); *Rodriguez*, 232 S.W.3d at 59–60. While a warrant may not be issued if it is based on illegally obtained information, "tainted" information will not invalidate an otherwise valid warrant. *State v. Bridges*, 977 S.W.2d 628, 632 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("The relevant inquiry into probable cause based upon a tainted affidavit is to put aside the tainted allegations and determine whether the independently acquired and lawful information clearly established probable cause."); *see Castillo v. State*, 818 S.W.2d 803, 805 (Tex. Crim. App. 1991) ("[I]f the tainted information was clearly unnecessary to establish probable cause for the search warrant, then the defendant could not have been harmed by the inclusion of the tainted information in the affidavit."); *see also Gates*, 462 U.S. at 238.

## B.    Discussion

It is undisputed that Agent Selby did not obtain a warrant or court order to get Cadriel's cell phone records. The evidence shows that the provider voluntarily gave this information to law enforcement, upon the representation that exigent circumstances existed. *See* 18 U.S.C.A. § 2702(b)(7)–(8) (setting out that one of the exceptions for disclosure of communications is exigent circumstances). Yet, even were we to conclude that exigent circumstances did not exist, that Agent Selby obtained the phone records in violation of section 2702 of the SCA, and that, because of the violation, the evidence was improperly obtained, we would still conclude that the trial court did not abuse its discretion in denying Cadriel's motion to suppress.

13

The affidavit signed by Police Chief Patrick Quill and filed in support of the search warrant follows in its entirety:

On March 31, 2012, at approximately 8:10 a.m. the body of Brisna Mireles was discovered on the eastside of Northbound Frontage Road U.S. 77, in the Town of Combes, Texas. An autopsy of the body of Brisna Mireles revealed the causes of her death to be two gunshot wounds to her head, a gunshot wound to her back, a gunshot wound to her right shoulder area, and a gunshot wound to her pelvic area. The recovery of three projectiles from Brisna Mireles and the recovery of one projectile found in the ground within close proximity of her body provide evidence that someone likely killed her. The murder of Brisna Mireles is presently under investigation by affiant.

On March 31, 2012, while processing the crime scene, a key to a hotel room identified as Hudson House Hotel, located in Harlingen, Texas, was discovered a few inches from Brisna Mireles' body. Combes Police Investigator Ricardo Herrera found that the key was registered to room #52 of the Hudson House Hotel, which was found to be registered to a male subject identified as Robert Castillo.

Shortly thereafter affiant made contact with family members of Brisna Mireles who stated that she was last seen with a male subject identified as an uncle, AKA "Randy". A family member provided the cellular telephone number . . . which Brisna Mireles was known to contact "Randy". The family member provided a physical description of "Randy" stating he was a male subject in his late 50s, gray hair and gray beard. This was the same physical description as provided by the hotel manager of the Hudson House Hotel of the male subject registered to room #52. A preliminary check of the telephone number identified as "Randy's" revealed that the telephone number belonged to the suspected party identified as Aroldo Humberto Cadriel date of birth 09/16/1946. Once the telephone number was identified as belonging to Aroldo H Cadriel, a photo lineup was prepared and shown to witnesses present at the Hudson House Hotel as well as several associates and family members of Brisna Mireles. Witnesses at the Hudson House Hotel identified Aroldo H. Cadriel as the individual registered to room #52 under the name Robert Castillo. Associates and family members of Brisna Mireles all identified the individual as the person known as "Randy" and numerous associates of Brisna Mireles stated that this was not a blood relative of Brisna Mireles but an individual that had a long-standing sexual relationship for which Brisna Mireles received monetary compensation.

14

Texas Ranger Mike Ramirez made contact via telephone with Aroldo H. Cadriel. Aroldo H. Cadriel met with Ranger Ramirez and affiant and stated that he had been with Brisna Mireles on March 30, 2012 for a short time, and then dropped her off at her residence in Harlingen, Texas. Aroldo H. Cadriel then stated that once Brisna Mireles was returned to her residence he returned to his residence located at 4 Crownridge Drive in Brownsville, Texas and went to sleep. Aroldo H. Cadriel stated that he did not remain in Harlingen, Texas and that he had not rented any hotel rooms in the Harlingen area on March 30, 2012. A short time later Ranger Ramirez and affiant met with a witness identified as Jacob Vento who stated that on March 30, 2012, at approximately 10:00 p.m. Brisna Mireles had called him to pick her up at the Hudson House Hotel. Jacob Vento stated to Ranger Ramirez and affiant that when he arrived at the hotel he found Brisna Mireles outside the hotel and was escorting her to his vehicle when he was confronted by Aroldo H. Cadriel in a threatening manner. Jacob Vento stated that Aroldo H. Cadriel displayed a handgun and placed the firearm against Jacob Vento's torso and told him to leave the area immediately. Jacob Vento stated that both he and Brisna Mireles ran away from Aroldo H. Cadriel and fled the area in Jacob Vento's vehicle.

On March 31, 2012, Ranger Ramirez interviewed a male subject identified as Frank Muniz who stated that he met with Brisna Mireles and a male subject who he identified through a photo lineup as being Aroldo H. Cadriel at 2:30 a.m. on March 31, 2012 and provided drugs to them. Frank Muniz stated that Aroldo H. Cadriel and Brisna Mireles were in a large white Ford pickup truck, which matched the description by previous witnesses as being used by Aroldo H. Cadriel. *A review of telephone tolls place Aroldo H. Cadriel in the Harlingen, Texas area beyond 4:00 a.m. March 31, 2012 rather than at his residence in Brownsville, Texas as he had previously stated.*

Affiant believes that the foregoing facts establish probable cause to believe that the offense of murder was committed on the eastside of Northbound Frontage Road U.S. 77, in the Town of Combes, Texas on or about the 31st day of March 2012.

(Italics added.) The italicized portion of the affidavit represents information obtained

from phone records that Cadriel claims were illegally obtained.

Our review of the affidavit reveals that Quill did reference information obtained from

Cadriel's cell phone records, which we assume for purposes of this analysis to be illegally

15

obtained or tainted information. Nonetheless, we will "set aside the tainted allegations and determine whether the independently acquired and lawful" information established probable cause. *Bridges*, 977 S.W.2d at 632.

Based on our de novo review of this issue, which involves mixed questions of law and fact, *see Crain*, 315 S.W.3d at 48, we cannot conclude that the tainted information was necessary to establish probable cause for the search warrant. *See Castillo*, 818 S.W.2d at 805. Instead, the affidavit referenced additional facts that were otherwise sufficient to establish probable cause. *See id.* The affidavit set out that Mireles's body was found on March 31, 2012, at approximately 8:10 a.m. Cadriel's hotel room key was located inches from Mireles's body. Cadriel had a sexual relationship with Mireles. And the night before the shooting, Mireles and another party were in front of Cadriel's hotel when Cadriel arrived. Cadriel was acting in a threatening manner and had a gun. Mireles and the other person ran from Cadriel. A second individual reported meeting with Cadriel and Mireles at 2:00 a.m. on the morning of the shooting and providing them with drugs. Cadriel and Mireles had been in a Ford truck that Cadriel used.

Putting aside the allegedly tainted information from the phone records, the independently acquired and lawful information clearly established probable cause for the search warrant. *See Bridges*, 977 S.W.2d at 632. The affidavit contained sufficient information, other than Cadriel's "tainted" cell phone records, for the trial court to find a "fair probability," *Rodriguez*, 232 S.W.3d at 60, that Cadriel had committed the murder of Brisna Mireles and that evidence of the murder would be found in Cadriel's residence. We conclude that the record supports the trial court's ruling, and the ruling is correct under

16

a theory of law applicable to this case. *See Ross*, 32 S.W.3d at 856; *Carmouche*, 10 S.W.3d at 327; *Ballard*, 987 S.W.2d at 891. The trial court did not err in denying Cadriel's motion to suppress. We overrule Cadriel's third issue.

## IV. ADMISSION OF THE Testimony of State's Ballistics Expert Richard Hitchcox

Cadriel describes his fourth issue as a sufficiency challenge. But his argument is that the trial court abused its discretion in allowing Richard Hitchcox, the State's forensic tool-mark expert, to testify. Cadriel asserts that systemic scientific problems in the field of tool-mark and firearms identification made Hitchcox's testimony unreliable. Because of these problems, Cadriel claims that Hitchcox could not conclusively determine whether the bullets and guns he examined were in fact the bullets and guns used in the shooting. Cadriel then contends that without Hitchcox's testimony, the evidence is insufficient to convict. The State responds that Cadriel failed to preserve a challenge to the reliability of Hitchcox's techniques for appellate review.[4]

### A. Applicable Law

To preserve a complaint for appellate review, the record must show that a specific and timely objection was made to the trial judge and that the trial judge ruled on the objection. TEX. R. APP. P. 33.1(a); *see Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). "The complaining party must let the trial judge know what she wants and why she thinks she is entitled to it, and do so clearly enough for the judge to understand

---

[4] We note that "an appellate court must consider *all* evidence actually admitted at trial in its sufficiency review . . . . '[A]n appellant . . . is not entitled to have an appellate court first consider the appellant's complaints concerning improper admitted evidence and, if it resolves any of those in favor of the appellant, to then, second, consider the sufficiency of the *properly-admitted* evidence to support the conviction.'" *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004) (quoting George E. Dix and Robert O. Dawson in 43A *Texas Practice, Criminal Practice and Procedures* § 43.531 at 742 (2d ed. 2001)).

and at a time when the trial court is in a position to do something about it." *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) (en banc)). A defendant who fails to preserve error regarding the admissibility of evidence waives his complaint on appeal. *Amspacher v. State*, 311 S.W.3d 564, 572 (Tex. App.—Waco 2009, no pet.). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

## B.   Discussion

At trial, Cadriel did not challenge the reliability of this expert's testimony in the field of tool-mark and firearms identification. Cadriel directs us to no specific and timely objection in the record, and we find none. *See* TEX. R. APP. P. 33.1(a); *Martinez*, 98 S.W.3d at 193. Moreover, Cadriel had the opportunity to cross-examine Hitchcox regarding his testing protocol, his results, and the reliability of those results. But Cadriel did not object to Hitchcox's testimony on the basis that it was unreliable. He did not let the trial judge know what he wanted and why, at a time when the trial court was in a position to do something about it. *See Bekendam*, 441 S.W.3d at 300. We conclude that Cadriel failed to preserve error regarding the reliability of this evidence. We overrule this fourth issue.

## V.   MOTION IN LIMINE

By his fifth issue, Cadriel complains that the trial court erred in failing to grant a

18

mistrial because of repeated violations of an order in limine.[5]  Cadriel complains of two separate instances of conduct, which he alleges violated the order in limine.

First, Cadriel complains of the State's conduct related to a statement made by Jovonnie Quiroz, one of the State's witnesses.  Quiroz testified that, about one month before the murder, he saw Cadriel and that Cadriel "had a gun on him, and a 12-guage, too."  Cadriel objected that the State's conduct in eliciting this testimony violated the order in limine because it presented evidence of an extraneous bad act.  The trial court inquired of Cadriel's trial counsel how the mere possession of a pistol and a shotgun was a bad act, and counsel responded that it imputed incidents with firearms.  The trial court found that the State's conduct did not violate the order in limine and overruled Cadriel's objection.

The second incident involved the testimony of Police Chief Quill.  He testified that during his continuing investigation of the murder, he went to Brownsville and met with a Brownsville Police Department officer at a location just west of Cadriel's residence.  When the State asked Quill what was the "point of that meeting," he responded, "Mr. Cadriel was firing a weapon in his backyard."  Cadriel objected that "this is going outside of the motion."  After the trial court sustained the objection, it explained that while Quill's

---

[5] Cadriel filed pre-trial motions in limine seeking, among other things, a bench conference before the introduction of evidence of prior bad acts.  Relevant language from Cadriel's motion in limine filed on September 9, 2013, follows:

> Any specific prior acts or misconduct of the defendant [shall] not be inquired into until the proper predicate has been established out of the presence of the jury, to include, but not limited to any prior arrests or convictions, specifically, but not limited to an arrest for discharging a firearm within city limits. . . .

The trial court granted this motion, rendering an order in limine.

19

response violated the order in limine, the testimony was unresponsive[6] and found that the State did not "intentionally [seek] to inject any offensive response by Chief Quill." Cadriel requested an instruction, and the trial court instructed the jury that the witness's last answer was nonresponsive. The trial court denied Cadriel's motion for mistrial.

## A.    Applicable Law

A mistrial is appropriate only when the improper conduct was "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc) (citation omitted). A mistrial is required only in extreme circumstances when the prejudice is incurable. *Id.*

## B.    Standard of Review

Whether a mistrial was warranted lies within the trial court's discretion, and the appellate court reviewing that decision for an abuse of discretion will only reverse if the trial court's ruling lies outside the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In determining whether the trial court abused its discretion by denying a motion for mistrial, the reviewing court should consider the severity of the misconduct, i.e., the magnitude of the prejudicial effect, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.* at 700; *Hawkins*, 135 S.W.3d at 77.

## C.    Discussion

In this case, we cannot say that the circumstances were so extreme that any prejudice was incurable. Considering the severity of the State's conduct in the first

---

[6] The trial court explained that the response was not responsive because it addressed what Cadriel was doing instead of "the point of the meeting."

20

instance, the trial court concluded that its conduct was not improper. The court inquired how the mere possession of a pistol and a shotgun could be a bad act such that the State's conduct in eliciting this testimony violated the order in limine. Reasoning that it could not, the court overruled Cadriel's objection to this testimony. In the second instance, the trial court determined that the State did not solicit Quill's reference to Cadriel's firing a gun and that it did not pose an offending question in an effort to elicit the testimony. In other words, there is no showing that the State's conduct was improper in the first instance or that it was intentional in the second instance. *See Archie*, 221 S.W.3d at 700. Also, the trial court instructed the jury to disregard Quill's answer—that Cadriel was shooting a weapon in his yard—as nonresponsive. "Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial." *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). And we must presume that the jury followed the trial court's admonishment. *See Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). So the trial court adopted measures, which we consider sufficient, to cure this misconduct. *See Archie*, 221 S.W.3d at 700.

Finally, even absent the complained-of conduct, after reviewing the record, we conclude that it is likely that a guilty verdict would have been obtained. Taking into account all of the evidence, we can see no significant likelihood that Cadriel would have been found not guilty if the questions had never been asked. *See id.* We conclude that the trial court did not abuse its discretion in denying the requested mistrial. We overrule Cadriel's fifth issue.

21

## VI.   VIDEO STATEMENT OF ALICIA MIRELES

In his sixth issue, Cadriel argues that the State violated his constitutional rights to due process when he was tried after the alleged destruction of exculpatory evidence— the video statement of Alicia Mireles (Ms. Mireles), the victim's mother.[7]   In the alternative, Cadriel contends that the trial court erred in refusing to strike Ms. Mireles's testimony and to grant a mistrial because the State failed to produce the video statement after her direct examination.   See TEX. R. EVID. 615.

### A.   Due-Process Claim

The duty to preserve evidence is limited to the evidence that possesses an exculpatory value that was apparent before the evidence was destroyed.   *California v. Trombetta*, 467 U.S. 479, 488 (1984).   In order to establish a due process claim, a defendant must make some showing that the lost evidence was favorable and material to his defense.   *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982); *Nastu v. State*, 589 S.W.2d 434, 441 (Tex. Crim. App. 1979).   And a criminal defendant must show bad faith on the part of the police or the prosecution, in this case, to establish that failure to preserve potentially useful evidence constitutes a denial of due process.   *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Penix v. State*, 488 S.W.2d 86, 89 (Tex. Crim. App. 1972).

### 1.   No Showing That the Video Statement Was Exculpatory or Favorable, and Material

Cadriel argues that if the video statement could have been examined and if it was

---

[7] During Ms. Mireles's cross-examination, the video statement was described as being taken by Texas Ranger Mike Ramirez twenty-three days after the shooting.

determined that there were inconsistencies between Ms. Mireles's video statement and her testimony at trial, then her credibility might have been impeached. But a showing that the video statement might have been favorable and material does not meet the standard; instead, Cadriel must make an affirmative showing that the evidence was favorable and material. *See Hebert v. State*, 836 S.W.2d 252, 254 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (op. on reh'g); *Gamboa v. State*, 774 S.W.2d 111, 112 (Tex. App.—Fort Worth 1989, pet. ref'd). In addition, sources of comparable evidence—Ms. Mireles and Ranger Ramirez, who took the video statement—were available for questioning on the circumstances and substance of the video statement. *See Hebert*, 836 S.W.2d at 254. Cadriel cross-examined Ms. Mireles. He also received a copy of Ranger Ramirez's written notes of his interview with Ms. Mireles. Yet we find nowhere in the record that the lost evidence was exculpatory or favorable and material. *See Valenzuela-Bernal*, 458 U.S. at 873; *Nastu*, 589 S.W.2d at 441. So we conclude that Cadriel failed to meet his burden of affirmatively showing that the video statement was either exculpatory or favorable and material. *See Hebert*, 836 S.W.2d at 254; *Gamboa*, 774 S.W.2d at 112.

## 2. No Showing that the State Acted in Bad Faith

Regarding bad faith, the record is also devoid of any fact showing bad faith on the part of the State, Ranger Ramirez, or the police. *See Youngblood*, 488 U.S. at 58; *Penix*, 488 S.W.2d at 89. Instead, the record shows that the State was not aware of any video statement. In addition, the record shows that neither Ranger Ramirez nor the police knew what happened to the video statement. And a showing of negligence on the part

23

of the police or the government is not equivalent to bad faith. *See Saldana v. State*, 783 S.W.2d 22, 24 (Tex. App.—Austin 1990, no pet.) (per curiam); *see also United States v. Kennedy*, 714 F.2d 968, 975 (9th Cir. 1983). We conclude that Cadriel has not shown that the State acted in bad faith.

## B.    Rule 615 Claim

In the alternative, Cadriel contends that the trial court improperly refused to strike Ms. Mireles's testimony or to grant a mistrial. *See* TEX. R. EVID. 615. We disagree.

On cross-examination, Cadriel asked Ms. Mireles if she had made a statement to law enforcement, and she responded, "Yes." Cadriel asked the State to tender the statement to defense counsel. Later, at a hearing outside the presence of the jury, after acknowledging that Ms. Mireles gave a video statement to Ranger Ramirez, the State informed the trial court that it had never received the statement and was uncertain as to what happened to the statement, but that it no longer existed. And, as noted above, neither Ranger Ramirez nor the police knew where the video statement was. Cadriel moved that the trial court strike Ms. Mireles's testimony and grant a mistrial under rule 615(e). The trial court denied the motion.

Texas Rule of Evidence 615 provides the following:

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified. . . .

(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court

24

shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

*Id.* By its plain language, rule 615(a) requires a party to produce witness statements that are in "their possession." *Id.* In *Jenkins v. State*, the Texas Court of Criminal Appeals held that rule 615 only requires a prosecutor to produce witness statements that are "in the prosecutor's possession" or in the possession of the "prosecutorial arm of the government." 912 S.W.2d 793, 819 (Tex. Crim. App. 1993) (op. on reh'g) (en banc); *see Dancer v. State*, 253 S.W.3d 368, 370 (Tex. App.—Fort Worth 2008, pet. ref'd) (per curiam) (mem. op.).

The record in this case shows that at the time of trial the statement was not in the possession of the State. The prosecutor affirmatively represented to the trial court that he did not have Ms. Mireles's video statement and that he did not know what happened to it. The record establishes that neither the State, Ranger Ramirez, nor the police physically possessed the statement at the time Cadriel requested it. The record also shows that the statement was not within their control and was not readily accessible to them. According to the State, "[n]obody has it anymore. That's what we agreed on." And the trial court found that Cadriel had made no

> suggestion or any direct implication . . . that the responsibility for this misplacement or loss is at the feet of the office of the district attorney. . . . It seems to rest—the responsibility tends to rest either at the feet of the office of the Texas Ranger or at the Combes Police [D]epartment . . . and neither side [is] able to account for it.

Upon the record and the findings of the trial court, this Court can only conclude that Ms. Mireles's video statement was not in the State's possession for purposes of rule 615.

25

The trial court could not have ordered the State to produce the video statement. *See* TEX. R. EVID. 615(a).

Furthermore, section (e) of rule 615 requires sanctions only "[i]f the other party[, or in this case, the attorney for the State] elects not to comply with an order to deliver a statement to the moving party." *Id.* R. 615(e). Yet because the State did not possess Ms. Mireles's statement, the trial court did not order the State to deliver it to Cadriel. Because the trial court never ordered the State to deliver the statement to Cadriel, the State could not have elected not to comply with such an order. *See id.*; *see also Marquez v. State*, 757 S.W.2d 101, 103 (Tex. App.—San Antonio 1988, pet. ref'd).

Based on the above, we conclude that the trial court properly denied Cadriel's rule 615 motion for production and for sanctions.

## C. Summary

We overrule Cadriel's sixth issue.

### VII. CONCLUSION

We affirm.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 24th
day of September, 2015.

26